******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* LARRY LAMAR STEPHENSON
## (AC 38674)

Sheldon, Bright and Bear, Js.

*Syllabus*

Convicted of the crimes of failure to appear in the first degree, possession of narcotics, engaging police in a motor vehicle pursuit, falsely reporting an incident in the second degree and interfering with an officer, the defendant appealed to this court. The defendant had led the police on a high speed motor vehicle chase after which he abandoned his vehicle in a parking lot and fled on foot. The police recovered narcotics from the vehicle, and found the defendant's driver's license and mail that was addressed to him in the vehicle. *Held*:

1. The trial court did not abuse its discretion or violate the defendant's constitutional right to counsel when it denied the defendant's request for a ten minute recess to discuss with his attorney a plea deal that had been offered by the court, as the court properly considered the legitimacy and timing of the request, and its impact on the litigants and the jury, which was waiting to resume hearing evidence, and had afforded the defendant ample time to consider multiple plea offers throughout the pendency of his case and while trial was underway, and its denial of the defendant's request was neither unreasonable nor arbitrary; moreover, the defendant expressed to the court on the morning of the commencement of evidence that he did not want to accept any plea, and the court's view that further time was unnecessary was understandable, as the court's plea offer was similar to one that the court told the defendant it would accept before evidence started, which the defendant had rejected, and nothing in the record suggested that the defendant was precluded from speaking to his attorney when the court recessed so that the trial judge could take the bench and resume the jury trial.

2. The evidence was sufficient to sustain the defendant's conviction of possession of narcotics, as the state presented circumstantial evidence from which the jury reasonably could have inferred that the defendant had exclusive control of the vehicle in which the narcotics were found just minutes before he was apprehended and that he constructively possessed the narcotics that were recovered from that vehicle; the defendant was apprehended a few blocks from the parking lot where the vehicle was found and where the police first encountered the vehicle, the defendant was identified by a police officer as the man the officer had seen driving the vehicle just minutes earlier, the defendant, in a phone call to the police in which he falsely reported that the vehicle had been stolen, admitted that he had been driving it on the evening of the events at issue, his mother testified that he used the vehicle while managing property for her, and the jury reasonably could have inferred that he attempted to avoid being caught with narcotics in his possession on the basis of his conduct, which included leading the police on a high speed chase, engaging in extensive efforts to evade them, driving away when the officer ordered him to exit the vehicle and then fleeing on foot.

Argued February 5—officially released May 1, 2018

*Procedural History*

Substitute information, in the first case, charging the defendant with the crime of failure to appear in the first degree, and substitute information in the second and third cases, charging the defendant with the crimes of possession of narcotics, engaging police in a motor vehicle pursuit, falsely reporting an incident in the second degree and interfering with an officer, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the cases were consolidated and tried

to the jury before *Colin*, *J.*; thereafter, the court, *White*, *J.*, denied the defendant's motion for a continuance; verdicts of guilty, subsequently, the court, *Colin*, *J.*, rendered judgments in accordance with the verdicts, from which the defendant appealed to this court. *Affirmed.*

*James P. Sexton*, assigned counsel, with whom were *Emily Graner Sexton*, assigned counsel, and, on the brief, *Marina L. Green*, assigned counsel, and *Megan L. Wade*, assigned counsel, for the appellant (defendant).

*Nancy L. Walker*, assistant state's attorney, with whom, on the brief, were *Richard J. Colangelo*, *Jr.*, state's attorney, and *Paul J. Ferencek*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Larry Lamar Stephenson, appeals from the judgments of conviction, rendered after a jury trial, on charges of failure to appear in the first degree in violation of General Statutes § 53a-172 (a) (1); possession of narcotics in violation of General Statutes § 21a-279 (a); engaging police in a motor vehicle pursuit in violation of General Statutes § 14-223 (b); falsely reporting an incident in the second degree in violation of General Statutes § 53a-180c (a) (1); and interfering with an officer in violation of General Statutes § 53a-167a (a). On appeal, the defendant claims that (1) the trial court abused its discretion and deprived him of his sixth amendment right to counsel by denying his request for a recess to discuss with his attorney the terms of a plea deal offered by the court; and (2) the evidence adduced at trial was insufficient to sustain his conviction of possession of narcotics. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. At approximately 10:15 p.m. on the night of October 9, 2013, Sergeant Richard Gasparino, a member of the narcotics and organized crime unit of the Stamford Police Department, was patrolling the east side of Stamford with three fellow officers in an unmarked Chevrolet Malibu. Gasparino pulled into the parking lot of 1 Lawn Avenue, a multiunit public housing complex, which is known as a high crime area due to narcotics activity and thus is regularly patrolled. Upon entering the parking lot, Gasparino observed a silver Jeep Liberty bearing license plate number 388 ZTO,[1] idling with its lights off parked next to a dumpster, with a black male sitting in the driver's seat. As Gasparino drove past the Jeep Liberty, it sped out of the lot "at a fairly high rate of speed." Finding that suspicious, Gasparino turned his vehicle around and followed the Jeep Liberty. After the Jeep Liberty exited the parking lot onto Lawn Avenue, it accelerated. One of the other officers in the Malibu then put a flashing emergency light on the top of the vehicle and activated it as Gasparino pursued and attempted to stop the Jeep Liberty. Gasparino notified his dispatcher that he was attempting to stop a fleeing vehicle, as he followed it onto Hamilton Avenue. Gasparino followed the Jeep Liberty onto Glenbrook Road, at which time Officer Wilgins Altera, driving a marked cruiser, took over the lead in the pursuit. Altera, in addition to other officers who had joined in the pursuit, followed the Jeep Liberty in their marked vehicles with their lights and sirens on. The Jeep Liberty proceeded erratically through residential areas and into downtown Stamford, trying to elude the pursuing vehicles by weaving in and out between other moving vehicles, crossing over the yellow line, and disregarding traffic signals and stop signs. The Jeep Liberty was then pursued onto Interstate 95, northbound, on which it

travelled to the next exit, exit nine, where it exited onto Seaside Avenue. There it turned left onto East Main Street and travelled approximately fifty yards before turning back onto Interstate 95, in the southbound lanes, where it encountered "gridlock" traffic and was forced to come to a "[d]ead stop." When this occurred, Altera and Gasparino also stopped their vehicles, then Altera exited his vehicle, "drew [his] sidearm and ran up around the front of [his] vehicle and to the front passenger side of the suspect's vehicle." While standing at the passenger's side window of the Jeep Liberty, Altera ordered the operator to turn off the engine and exit the vehicle. Although Altera repeated that order several times, the operator did not acknowledge Altera and instead continued looking forward for about thirty seconds to one minute. The operator finally turned his head to look directly at Altera, "then proceed[ed] forward, kind of jolted the car a little bit forward making contact with a vehicle." The Jeep Liberty finally "inch[ed] its way around traffic, and then started heading . . . southbound [once again] on [Interstate] 95." Altera was unable to get back to his car in time to follow the Jeep Liberty, which had made its way into the breakdown lane, so he crossed through the traffic on foot to get a view of where it was heading. Altera lost sight of the vehicle as it appeared to be "heading off of exit eight." Because of the heavily congested traffic, neither Altera nor Gasparino was able to pursue the Jeep Liberty, so Gasparino "put out over [the police] dispatch . . . for surrounding units to start looking for the vehicle . . . ." Surmising that the Jeep Liberty likely exited the interstate at exit eight, Gasparino, too, started looking for the vehicle in that vicinity, "[b]asically . . . the downtown area."

Shortly thereafter, Gasparino learned that the Jeep Liberty had been found abandoned by Officer Jerry Junes at the Marriott Hotel in downtown Stamford, approximately two hundred yards from exit eight. Junes spoke to a patron at the hotel bar, who stated that he had seen a man exit the Jeep Liberty and run away. He described that man as a heavyset black male, five foot, nine inches, to six feet tall, wearing a green or dark baseball cap, a gray sweatshirt and jeans. Junes reported that description to his dispatcher.

Because the vehicle was found unattended, it had to be inventoried and towed. Gasparino and Officer Louis Vidal seized several items from the vehicle. On the driver's seat of the Jeep Liberty, Gasparino found a driver's license belonging to the defendant. In the driver's door compartment, Vidal discovered "a clear plastic wrap which contained a white rock-like substance," that appeared, and was later confirmed, to be crack cocaine. The officers also found three items of mail in the center console—two letters and one bank statement—which were addressed to the defendant. Also in the center console of the vehicle, the officers found a bottle of

oxycodone, prescribed to Nicole Cyboski, who was a known drug user with a criminal record.

While the officers were searching the vehicle, they received a notification from their dispatcher that "there was a party on the line that was reporting that vehicle stolen, the one that we were chasing." The caller identified himself, by name, as the defendant, and stated that he had parked his Jeep Liberty near Lawn Avenue in Stamford, with the keys in it, and crossed the street to use the bathroom at Dunkin Donuts. When he returned to the vehicle, he reported, it was gone. He indicated that he was reporting the theft "to cover my footsteps so that [it] could be shown that I wasn't the one driving the car." The defendant claimed to be calling from Norwalk, but the call was traced to a location in Stamford within a two block radius of the intersection of Orange and Lockwood, just one block away from 1 Lawn Avenue.

With that information, Gasparino and his three fellow officers drove to the intersection of Lockwood and Orange to look for the caller, who they considered a possible suspect. When they entered the parking lot, they observed two or three people standing in the back staircase of a housing complex, an area where people often hung out, that was illuminated with "flood lighting." The officers saw someone in that location who matched the description of their suspect—a black male wearing a gray sweatshirt and jeans. They believed that that man, who was using a cell phone, looked like and met the physical description of the defendant, as shown on the driver's license found in the Jeep Liberty. Gasparino also testified that he knew the defendant from dealing with him in the past. On that basis, they pulled up to the staircase and stopped their car. "The minute [their] car doors open[ed], that individual took off running northbound through the complex." He was wearing a baggy gray sweatshirt and was running "at a high rate of speed." The four officers chased the suspect on foot, until he jumped down a retaining wall and ran down the street, where they lost him.

The officers then set up a perimeter around the area, as additional officers responded and joined in the search. Approximately three minutes later, Sergeant Sean McGowan saw an individual running across East Main Street. McGowan and other officers pursued and apprehended the defendant in the parking lot of Sergio's Pizza, near the intersection of Lawn Avenue and East Main Street. Sergio's Pizza is next to Dunkin Donuts, across the street from 1 Lawn Avenue.

The defendant was arrested on charges of failure to appear in the first degree in violation of § 53a-172 (a) (1);[2] possession of narcotics in violation of § 21a-279 (a); engaging police in a motor vehicle pursuit in violation of § 14-223 (b); falsely reporting an incident in the second degree in violation of § 53a-180c (a) (1); and interfering

with an officer in violation of § 53a-167a (a). After he was found guilty by a jury on those charges, the court imposed a total effective sentence of five years incarceration, consecutive to a sentence that he was then serving,[3] followed by five years of special parole. This appeal followed.

I

The defendant first claims that the trial court abused its discretion and violated his constitutional right to counsel by denying his request for a recess to discuss with his attorney the terms of a plea deal offered by the court. We are not persuaded.

The following procedural history is relevant to our discussion of this claim. On the morning of July 21, 2014, just before the start of evidence at trial, the court, *White, J.*, had a discussion with counsel on the record regarding various plea agreements that had been offered to, but rejected by, the defendant.[4] Following a lengthy recitation by counsel as to the various pleas that the defendant had considered, the court stated, inter alia: "The only plea I'd accept would be an open plea, with no recommendation at all. And the court will review a [presentence investigation report], hear the arguments and make a decision." When asked if he understood what that meant, the defendant said that he did, but that he did not want to accept that offer, that he did not want to take any offer, and that he had spoken with his attorney and was ready to proceed to trial. The trial thus proceeded.

The state began the presentation of its evidence against the defendant on July 21, 2014, before Judge Colin. On July 23, 2014, at some point prior to the luncheon recess, the court adjourned for the day, planning to reconvene the next morning. Just before the court adjourned, counsel for the defendant asked the court's permission to remain in the courtroom so that the defendant's mother could "just have two seconds to communicate with him" and "have a quick colloquy about a potential settlement." The court left that decision to the discretion of the judicial marshals, then adjourned for the day. The record does not reveal whether the requested colloquy took place, or, if it did, how long it lasted.

The next morning, Judge White took the bench to discuss plea negotiations once again. The court then indicated that it had met with the prosecutor and defense counsel the preceding afternoon, at which time the prosecutor had offered to drop the narcotics charge and the interfering with an officer charge, and to recommend a sentence of five years incarceration on the remaining three charges, to be served concurrently with the sentence the defendant was then serving. The court told counsel that it would consider the state's offer overnight. The next morning, July 24, 2014, the court

met with counsel in chambers and informed them that it would accept the state's recommendation of five years, but only as a floor, and that Judge Colin would do the actual sentencing and could impose a sentence of up to seven years consecutive to the sentence that the defendant was then serving. The state made it clear that it was looking for a sentence of no more than five years incarceration, to be served concurrently with the sentence that the defendant was already serving. The defendant and his attorney asked for more time for him to consider the court's offer, his attorney indicating that they had only had about seven uninterrupted minutes between the in-chambers conference with Judge White and the calling of the defendant's case, to discuss the court's offer. The defendant asked to come back the next day or the following week to "make a decision . . . ." His attorney told him to ask for a ten minute recess, but the defendant indicated to his attorney that the court had already told him no. The court responded that it had already passed the defendant's case to give him time to consider the offer. The court explained that it was not going to entertain further discussions because they were in the midst of trial and the jury was waiting. The court then recessed to await Judge Colin for trial to resume.[5]

The defendant claims that the trial court abused its discretion and violated his constitutional right to counsel by not granting his request for a ten minute recess to further discuss with counsel the plea offered by the court. The sixth amendment provides that in all criminal prosecutions, the accused shall enjoy the right to the effective assistance of counsel. U.S. Const., amend. VI. This right is incorporated against the states through the due process clause of the fourteenth amendment. See U.S. Const., amend. XIV, § 1; *Gideon* v. *Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963). "Although the defendant couches his claim on appeal in terms of a denial of his constitutional right [to counsel], we will review the trial court's refusal to grant a continuance for an abuse of discretion. Even if the denial of a motion for a continuance . . . can be directly linked to a claim of a denial of a specific constitutional right, if the reasons given for the continuance do not support any interference with the specific constitutional right, the court's analysis will revolve around whether the trial court abused its discretion. . . . In other words, the constitutional right alleged to have been violated must be shown, not merely alleged." (Citation omitted; internal quotation marks omitted.) *State* v. *Godbolt*, 161 Conn. App. 367, 374 n.4, 127 A.3d 1139 (2015), cert. denied, 320 Conn. 931, 134 A.3d 621 (2016). Furthermore, "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiablerequest for delay violates the right to the assistance of counsel." (Internal quotation marks

omitted.) *Morris* v. *Slappy*, 461 U.S. 1, 11–12, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983).

"The determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. . . .

"A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . To prove an abuse of discretion, an appellant must show that the trial court's denial of a request for a continuance was arbitrary. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. . . . In the event that the trial court acted unreasonably in denying a continuance, the reviewing court must also engage in harmless error analysis. . . .

"Among the factors that may enter into the court's exercise of discretion in considering a request for a continuance are the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; the defendant's personal responsibility for the timing of the request; [and] the likelihood that the denial would substantially impair the defendant's ability to defend himself . . . . We are especially hesitant to find an abuse of discretion where the court has denied a motion for continuance made on the day of the trial. . . .

"Lastly, we emphasize that an appellate court should limit its assessment of the reasonableness of the trial court's exercise of its discretion to a consideration of those factors, on the record, that were presented to the trial court, or of which that court was aware, at the time of its ruling on the motion for a continuance." (Internal quotation marks omitted.) *State* v. *Godbolt*, supra, 161 Conn. App. 374–75. "The trial court has the responsibility to avoid unnecessary interruptions, to maintain the orderly procedure of the court docket, and to prevent any interference with the fair administration of justice. . . . Once a trial has begun . . . a defendant's right to due process . . . [does not entitle] him to a continuance upon demand." (Internal quotation marks omitted.) Id., 376.

Our review of the record reveals that the defendant was afforded ample time to consider various plea offers extended to him throughout the pendency of his case, and, in fact, while his jury trial was underway. The record reflects that the defendant had considered multi-

ple offers extended by the state, and had expressed that he did not want to accept any plea at all, as of the morning of the commencement of the presentation of evidence. The court, at the request of the state, canvassed the defendant thoroughly that morning. The record further reflects that the court clearly stated to the defendant before the start of evidence that the only offer the court would entertain was an open plea with no recommendation. The record also reflects that the defendant was offered ample time to consider the offers extended on July 23 and July 24, 2014. Although the record does not reflect at what time counsel met with Judge White in his chambers on the morning of July 24, 2014, or at what time Judge White addressed the parties from the bench, it does reveal that the defendant's case was "passed" to afford him time to discuss the court's offer with his attorney. The court noted that it was not going to entertain further discussions, referring to the extensive discussions that already had taken place, a clear indication that the court did not regard the defendant's request for additional time as legitimate. The court's view that further time was unnecessary is particularly understandable in that the court's offer basically left the defendant at risk to receive the maximum sentence permissible for the charges to which he would plead guilty. It was thus substantially similar to the open plea offer the court told the defendant it would accept before evidence started—an offer the defendant rejected. Although defense counsel suggested a ten minute recess, the defendant himself sought a longer period of time, either a full day or until the next week, to consider the court's offer. Moreover, Judge White did, in fact, recess, so that Judge Colin could take the bench and resume the jury trial. There is nothing in the record to suggest that the defendant was precluded from speaking to his attorney during that recess, the duration of which is also missing from the record.[6]

On the basis of the foregoing, we conclude that the trial court properly considered the legitimacy of the defendant's request for a recess to further consider its plea offer, the timing of that request for a continuance, and the impact on the litigants and, in particular, the jury, which was waiting to resume hearing evidence when the defendant made his request. Because the court's denial of the defendant's request was neither unreasonable nor arbitrary, we cannot conclude that the court abused its discretion in so ruling.[7]

## II

The defendant also claims that the evidence presented at trial was insufficient to sustain his conviction of possession of narcotics because the state failed to prove that he had actual or constructive possession of the narcotics at issue. We disagree.

"In reviewing the sufficiency of the evidence to sup-

port a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but that] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Crespo*, 317 Conn. 1, 16–17, 115 A.3d 447 (2015).

"In order to prove that a defendant is guilty of possession of narcotics . . . the state must prove beyond a reasonable doubt that the defendant had either actual or constructive possession of a narcotic substance. . . . Actual possession requires the defendant to have had direct physical contact with the narcotics. . . . Constructive possession, on the other hand, is possession without direct physical contact. . . . To prove either actual or constructive possession of a narcotic substance, the state must establish beyond a reasona-

doubt that the accused knew of the character of the drug and its presence, and exercised dominion and control over it. . . .

"Where . . . the [narcotic substance] was not found on the defendant's person, the state must proceed on the theory of constructive possession . . . . One factor that may be considered in determining whether a defendant is in constructive possession of narcotics is whether he is in possession of the premises where the narcotics are found. . . . Where the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and hadcontrol of them, unless there are other incriminating statements or circumstances tending to buttress such an inference. . . . In determining whether the attendant incriminating circumstances support an inference of constructive possession, the proper focus is on the relationship between the defendant and the contraband found in the [vehicle] rather than on the relationship between the defendant and the [vehicle] itself." (Citation omitted; internal quotation marks omitted.) *State* v. *Nova*, 161 Conn. App. 708, 718–19, 129 A.3d 146 (2015).

Here, because the narcotics were not found on the defendant's person, the state was required to prove that he possessed them constructively. Although the defendant was not in the Jeep Liberty when it was recovered by the officers, the state presented circumstantial evidence from which the jury reasonably could have inferred that he had exclusive control of the Jeep just minutes before he was apprehended. The defendant was apprehended only a few blocks from the Marriott Hotel at which the vehicle was found, which is also within a few blocks of 1 Lawn Avenue, where Gasparino and his fellow officers first encountered the vehicle. Altera testified that he saw the operator of the Jeep Liberty when he drew his gun and approached the vehicle, ordering the operator to exit the vehicle several times, until the operator turned toward him and then drove away. Even though the defendant was not wearing a gray sweatshirt when he was apprehended, Altera identified him as the man he had seen driving the Jeep Liberty minutes earlier. Altera testified that the entire chase—from the time that he got involved in the pursuit of the Jeep Liberty to the time that the defendant was apprehended—took approximately fifteen to twenty minutes. Additionally, the defendant's mother, Chiquita Stephenson, testified that she owns a rental property in Stamford that the defendant manages for her and that he uses her Jeep Liberty when doing so. Not only was the defendant's driver's license found on the driver's seat in the vehicle, but several pieces of mail addressed to him were found in the center console, and the defendant himself admitted that he had been driving the Jeep that evening, just minutes before he called 911 and reported that it had been stolen. The jury thus

reasonably could have found that the defendant was in possession and control of the Jeep Liberty and of the narcotics recovered therefrom.

The jury also could have inferred from the defendant's conduct—speeding away upon seeing the police at 1 Lawn Avenue, leading them on a high speed chase and engaging in extensive efforts to evade them, not surrendering to Altera when so ordered, and then fleeing on foot—that he was attempting to avoid being caught with the narcotics in his possession. In other words, the jury could have concluded that the defendant would not have fled unless he knew of the presence and nature of the narcotics in the vehicle.

On the basis of the foregoing, we conclude that the jury reasonably could have found, on the basis of the circumstantial evidence presented at trial, that the defendant constructively possessed the narcotics recovered from the Jeep Liberty he had been driving on the night of October 9, 2013. Accordingly, we conclude that the evidence presented at trial was sufficient to sustain the defendant's conviction of possession of narcotics.

The judgments are affirmed.

In this opinion the other judges concurred.

[1] At some point during the pursuit, Gasparino learned that the Jeep Liberty was registered to the defendant's mother, Chiquita Stephenson.

[2] This charge arose out of the defendant's failure to appear in court to answer to a charge that he violated his probation in an unrelated case. See footnote 3 of this opinion.

[3] The defendant was serving a four year sentence resulting from his violation of the conditions of his probation that was imposed on him after he was convicted of robbery and assault in 2007.

[4] The following discussion took place before Judge White before the first day of the trial:

"[The Prosecutor]: Judge, as Your Honor is aware, we're going to be beginning a jury trial in this case this morning. And prior to bringing the jury out before Judge Colin, who will be the presiding judge for the trial, I thought it was prudent if I could just put on the record efforts that I have made with defense counsel to try to resolve the case—

"The Court: All right.

"[The Prosecutor]: —if the court pleases. . . . So, I would just—I—I know that earlier on, when the case was pretried, I believe by Judge Comerford, this would have been in the late winter, early spring. I was not involved in those discussions at that point because this is a part B matter, and the part B prosecutors were handling it. But my understanding that—and there's a record of this—whatever the—whatever the court's offer was, that was rejected.

"And then in the summer time when I began preparing the case, I made efforts—[defense counsel] and I have had numerous discussions in trying to settle the case. And on July 3rd, I believe this is, actually, after—this was after jury selection had taken place, I offered the following disposition: possession of narcotics, engaging police in pursuit, issuing a false statement and failure to appear in the first degree would be a total effective jail sentence of five years on those counts, which would run concurrently with the sentence he's currently serving, which is four years.

"I had earlier—if I could just backtrack a little bit. When this case was set down for trial, this—earlier this summer in June, my offer was five, jail, followed by three years of special parole.

"After we picked a jury and counsel and I—and I had further discussions, I lowered the offered to what I had just indicated, a flat five year jail sentence with no special parole. . . . However, [the defendant] would have to lose credit for the time that he's in, been—been in jail because all of that credit,

pursuant to [Department of Correction] regulations is being applied to his [violation of probation] sentence. That would be about nine months of—of lost time that he would have done.

"I indicated to [defense counsel] that the defendant would have until July 10th to consider that offer; I believe that's a Thursday. And I indicated that I needed to know by one o'clock. That offer, apparently, the weekend came, I didn't hear anything and then I believe, thereafter, we had further discussions. And then at that point, I raised the offer to a total effective sentence of six years concurrent with the jail sentence—four year jail sentence he's currently serving. And, again, there would be no credit for time served. My understanding, as of last week, that that offer—that last offer was rejected, and so here we are today to begin the trial.

"The Court: All right. Do you want to say anything, [defense counsel]?

"[Defense Counsel]: Yes. One—two things. One, I did speak to the prosecutor and showed him a form that I filled out and had [the defendant] sign. And the form indicated that, please be advised that the state of Connecticut has accepted my counteroffer as follows, a guilty plea to engaging the police in a chase, possession of narcotics, false report of a crime and a failure to appear. The state agrees to give you one more year added to the four years you are serving on the [violation of probation] sentence. If you want this offer, please indicate by signing below. If you are refusing this offer, please indicate by signing below, as well.

"And just for the record, I met with [the defendant] at the [Bridgeport Correctional Center], presented him with this contract, and this was on July 12th, which is a Saturday, and I did share that with [the prosecutor].

"And I shared with him the fact that he at first rejected it after spending some time going over this with him, and prior to walking out of the jail, he called me back, the marshals opened up the cells, and he signed it, saying that he accepts that.

"So—so, I think that's important to put on the record. And I'd ask the court to canvass [the defendant] as to whether, in fact, he had—he had rejected this offer. And also, there was a second offer after we started trial of six years flat, with no special parole—

"[The Prosecutor]: Right. That's the current offer.

"[Defense Counsel]: The current offer—and I asked the court to canvass him on this July 12th offer that he rejected first and then signed after, and also whether he, in fact, rejects the current offer of six years flat.

"And I would just add, just to the benefit of [the defendant] and if there's any fault on my own, the state did say that he has to have this done by the twelfth, which is in the middle of the week, and I wasn't able to get there till Saturday. And as soon as he—I got a signed page, I e-mailed [the prosecutor] that same night, saying that it's twelve o'clock, this is what's going on, and he said we'll talk about it on Monday. So, if, in fact, he—the—he missed his ship because of me giving it Saturday, not Thursday, I just want to put that out there so it won't be charged against him.

"[The Prosecutor]: Well, I mean—I can—

"The Court: Hold—hold on for a second. I've got to admit, [defense counsel], I really don't understand what you said to me. You made a number of statements and it—it sounds to me like the bottom line is, the—[the defendant] has rejected every offer that's been made to him. You said something about him accepting an offer or—and apparently, he decided he wanted to accept an offer after he rejected it.

"[The Prosecutor]: It was accepted after it was no longer open.

"[Defense Counsel]: May—may—

"The Court: Then that's not—

"[Defense Counsel]: —may I approach?

"The Court: —that's not accepting an offer, then. Well, I don't really need to—to see that, I'm not really sure what you're handing me.

"[Defense Counsel]: I want—I'm just trying to clarify it, with your confusion. What I said was that I presented him with a contract and it had two lines, one is accept or reject, and the offer is what I read out to you on the record. I said prior to—to me leaving, he had signed that he rejected. But before I walked out of the prison, he called for the marshals to open up the cells. They opened up the cells; he said, bring that paper back. He scribbled out the rejection and signed that he accepted it. That's what I put on the record.

"[The Prosecutor]: And that was on the—

"The Court: Okay.

"[The Prosecutor]: And that was on the twelfth; the offer was open until one o'clock on July 10th. And so it wasn't open any more. I then upped the

offer one year—and all of this was subject to Your Honor's approval.

"The Court: All right. Well, the bottom line is, the state made various offers, when the offers were open, [the defendant] didn't accept them. And if an offer's been rejected, that's it, you can't accept—reject an offer and then accept it. So, I take it, well, the last best offer was six years to serve.

"[The Prosecutor]: That's correct.

"The Court: [Defendant], could you stand up, please. And I take it that's not open anymore? Or the state's not extending that anymore?

"[The Prosecutor]: I'll—that—that would be subject to Your Honor's approval.

"The Court: Well, I'm—you picked a jury, your witnesses are here, you're ready to go. The only plea I'd accept would be an open plea, with no recommendation at all. And the court will review a [presentence investigation report], hear the arguments and make a decision. So [defendant], did you understand what I just said?

"[The Defendant]: Yes, sir.

"The Court: Do you want to do that?

"[The Defendant]: No, I don't want to take that.

"The Court: Okay. And you understand the various offers you were made, correct?

"[The Defendant]: I was offered five years with three years special parole.

"The Court: Okay. And you rejected that, correct?

"[The Defendant]: I rejected that. Then—

"The Court: And then you were offered—what was it, five years—

"[The Prosecutor]: Flat—flat five.

"The Court: Flat five years to serve.

"[The Defendant]: No. To my knowledge, I was—I was offered a year concurrent to my four years—

"The Court: Okay.

"[The Defendant]: —which would have come up to five. And the last time I got here, they said it was two years concurrent to the four, which I already had, which would make it six—well, five for the first one, and then six in total for the—where we stand here and we're talking about now.

"The Court: Okay. But the bottom line is, you don't want to enter a guilty plea, which is your right, you have a right to a trial. So, you don't want any offer then, correct?

"[The Defendant]: No, sir.

"The Court: All right.

"[The Prosecutor]: Okay.

"The Court: And you've talked to your attorney about this?

"[The Defendant]: Yes, sir.

"The Court: Okay. And you're ready to go forward?

"[The Defendant]: Yes.

"The Court: Okay. Thank you.

"[The Prosecutor]: Thank you, Your Honor.

"The Court: We'll have Judge Colin come out, and you can start your trial. Thank you."

[5] The following colloquy occurred before Judge White about a plea settlement before trial resumed before Judge Colin:

"The Court: . . . The trial in this case is ongoing. Yesterday afternoon, I believe it was, [the prosecutor and] defense [counsel] came to me, [and] proposed a resolution to the case. And the bottom line of the resolution was a sentence of five years to serve concurrent with the sentence the defendant is now serving. And the lawyers jointly asked me to accept the recommendation. I indicated to the lawyers that I was going to think about it overnight.

"This morning, I met with counsel. I told counsel I would accept their proposal as a floor including no time—no credit for time served. And that was a part of the original offer, by the way. And correct me, gentlemen, if I'm misstating something.

"And we passed the case, [defense counsel], so you could discuss it with your client. And I'm told your client doesn't want it, which is fine. That's his right.

"But the parties approached the court with a resolution, and now the defendant doesn't want it. I'm not going to entertain—I'll give you a chance to speak, but I'm not going to entertain any more discussions. If the defendant is acquitted, he's going to walk and that will be the end of it. And if he's convicted, I think that he's facing a maximum of seven years consecutive to the amount of time he's doing now.

"[The Prosecutor]: Right. The only thing I would add is, I also agreed at

counsel's request to—for this agreement, I would drop the possession of narcotics charge and also the interfering charge. So, he would be only pleading to three charges. That would be failure to appear, which is a [class] D felony; engaging police in pursuit, which is an A misdemeanor; and issuing a false statement, which is an A misdemeanor.

"The Court: Let me back up for a minute; what are the charges he's being tried on right now?

"[The Prosecutor]: Right now, he's being charged with one count of failure to appear in the first degree.

"The Court: That's five years.

"[The Prosecutor]: Right. Second count is possession of narcotics.

"The Court: That's another seven years, so we're up to twelve years.

"[The Prosecutor]: Count two is engaging police, that's—

"The Court: That's another year, thirteen.

"[The Prosecutor]: Falsely reporting an incident, which is an additional year.

"The Court: Fourteen.

"[The Prosecutor]: And then finally, interfering, that's fifteen years.

"The Court: That's another year. It's fifteen years of exposure consecutive to the time he's now doing. I just want to restate this, if I have it correctly, the state and the defense came to me and they—both wanted to resolve the case for five years concurrent to the sentence he's now serving with no credit for time served. I said I would accept that as a floor with a maximum of, I believe it was seven years because you had indicated, [prosecutor], you were only going to put him to plea on failure to appear—

"[The Prosecutor]: And two misdemeanors.

"The Court: And two misdemeanors.

"[The Prosecutor]: So, his exposure would be at less than half at the— rather than proceeding to trial now.

"The Court: All right. So, you want to say something, [defense counsel]?

"[Defense Counsel]: Yes, Your Honor, just in defense of the defendant, what I presented to him this morning was a little different than what the state proposed. The state, as Your Honor sort of just indicated, proposed five years to run concurrent with the four, closed, end of deal. I presented to him that the court said that that five would be a floor and, essentially, this would be an open sentence where the judge, Judge Colin, Your Honor, said you'd send it back to Judge Colin.

"The Court: Yes, I didn't add that, but I was not going to be the sentencing Judge. Judge Colin has sat through the evidence—

"[Defense Counsel]: Correct. Okay.

"The Court: —and he's going to do the sentencing. And, by the way, I haven't discussed this with Judge Colin.

"[Defense Counsel]: Thank you, Judge. And so what I presented to [the defendant] was that Judge Colin would do the sentence and, essentially, it would be an open sentence with Judge Colin to give him up to seven years, and it could be consecutive to the five, so it can be twelve years, it could be a twelve year sentence. I can't make any promise. And I explained to him, that's not—I understand that's not the agreement that I presented to you yesterday, but having taken it to Your Honor, Judge White, that is, for the record, Your Honor did not accept the deal that we proposed and essentially made an open sentence with a floor of five?

"[The Prosecutor]: Exactly.

"The Court: Floor of five with no credit for time served.

"[Defense Counsel]: And so that was a little different than what we went over yesterday.

"The Court: That's true.

"[Defense Counsel]: I had about maybe ten to twelve minutes to kind of explain that to him. His mother did step in. And so, lots gone on today, and so he was not able to grasp all this in seven minutes and understand what all this means. And he says, well, I don't understand it, so I can't accept it.

"The Court: Okay. Well, you had a chance to talk to him yesterday about what the state had offered, and I modified that offer somewhat.

"[Defense Counsel]: Yes.

"The Court: I wasn't going to accept what the state and defense had proposed, so my offer was a little different. And you had time to talk to your client about it; the jury is waiting. So, what, if anything, do you want to say, [defendant]?

"[The Defendant]: I mean, I'm gettin' all different type of offers, and like you said, I'm really not able to commit and make any type of plea bargain because the way it's all coming to me at once, it's this, then it's this, then

it's that. So, if you would like, you know, to come back maybe Friday or next week.

"The Court: No. We're going forward today.

"[The Defendant]: Well, other than that, I can't really comprehend everything that's coming at me at this time in a twelve minute span, so I'm not able to make a decision about my life in twelve minutes.

"The Court: Okay. All right. Well, I will just indicate that the last best offer that the court would accept was the five—it was the five years to serve, concurrent, with no credit for time served, and I'd order a [presentence investigation report], Judge Colin would do the sentencing, I would not. And Judge Colin—I heard the [prosecutor] say it, I believe I heard the [prosecutor] say that the state's not looking for any more than five years—

"[The Prosecutor]: No. I would only—I know [the defendant] from past cases. I'm familiar with his background. I know the court wanted a [presentence investigation report]. I would not be asking more than the sentence of five years to run concurrently. In essence it would amount to an additional time of about a year and ten months more than what he is serving now.

"The Court: Okay. So, the state's not looking for any more than five years to serve concurrent without any credit for time served, and the state has said that.

"[The Prosecutor]: Correct.

"The Court: And if Judge Colin goes along with that, fine. But if Judge Colin wants to impose a greater sentence, it would be up to him. So, you understand what I just told you?

"[The Defendant]: Yes, sir.

"The Court: And do you want to accept that or do you want to have—continue with your trial?

"[The Defendant]: I'm not sure.

"The Court: Well, it's one or the other, sir.

"[Defense Counsel]: Do you need time to talk to me about it?

"[The Defendant]: Of course.

"[Defense Counsel]: Request that.

"The Court: What's that?

"[The Defendant]: I did. He told me no.

"The Court: I've already given you time. You've had time to talk. We've got a jury waiting. So, if you don't want it, that's fine. It's your right. You're in the midst of a trial.

"[The Defendant]: I never said I don't want it. I said I can't say yes or no.

"The Court: Okay.

"[Defense Counsel]: Can we have ten minutes, please?

"The Court: I'll let Judge Colin know. You can bring out the jury, and you can resume your trial. Thank you. You can see Judge Colin. Thank you.

"(Recess)."

[6] The defendant also could have achieved the same result as accepting Judge White's offer at any time after the hearing before Judge White by simply entering an open plea to the three charges as to which the state was seeking guilty pleas. His maximum exposure would have been seven years consecutive to his current sentence, precisely the offer made by Judge White.

[7] The defendant also claims that the court constructively violated his sixth amendment right to counsel by denying his request for additional time to consider the court's plea offer, and that because that denial arose at a critical stage in the proceedings, prejudice arising from that denial is presumed pursuant to *United States* v. *Cronic*, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). Although the defendant is correct in his assertion that the decision of whether to accept a plea offer is a critical stage of a criminal proceeding at which a criminal defendant is constitutionally entitled to the effective assistance of counsel, we cannot conclude that the court's denial of a ten minute recess resulted in a "complete failure" of representation by his attorney, as required to trigger the automatic presumption of prejudice under *Cronic*. Id., 662–66.

----