******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# MARCUS FAIR *v.* COMMISSIONER OF CORRECTION
## (AC 43583)

Prescott, Cradle and Suarez, Js.

*Syllabus*

The petitioner, who had been convicted of murder and criminal possession of a firearm, sought a writ of habeas corpus, claiming that his trial counsel provided ineffective assistance. Following an evidentiary hearing, the habeas court denied the petition, concluding that the petitioner had failed to demonstrate that his trial counsel had acted deficiently by failing to present certain expert testimony or to impeach a testifying witness, M, regarding M's alleged motivation to testify untruthfully, and that any failure on behalf of the petitioner's trial counsel to impeach M with respect to M's conflicting statements regarding the identification of the shooter did not prejudice the petitioner. Thereafter, the habeas court denied the petition for certification to appeal, and the petitioner appealed to this court. *Held* that the habeas court did not abuse its discretion in denying the petition for certification to appeal, the petitioner having failed to demonstrate that the issues raised in his petition were debatable among jurists of reason, that the court could have resolved the issues in a different manner or that the questions were adequate to deserve encouragement to proceed further; the petitioner failed to demonstrate that he was prejudiced by the alleged deficient performance of his trial counsel, as the petitioner failed to demonstrate that the outcome of his trial would have been different if his trial counsel had presented evidence about the Jamaican etymology of a term that was allegedly used by the shooter when he fired his weapon, as there was no evidence that the term could be used only by a person of Jamaican descent and, in light of the evidence presented at trial that the shooter was wearing a Jamaican hat and fake dreadlocks, the jury could have inferred that the petitioner used the term in an effort to conceal his identity; moreover, the petitioner failed to present any credible evidence in support of his theory that M agreed to cooperate with the police to avoid criminal liability and also failed to demonstrate that any further inquiry into the matter was likely to have affected the jury's assessment of M's testimony; furthermore, the petitioner failed to demonstrate that he was prejudiced by his trial counsel's alleged failure to impeach M concerning the fact that M had made inconsistent statements to the police regarding the shooter's identity, as these statements were presented to the jury during the criminal trial and the state presented proof, independent of M's testimony, of the petitioner's guilt beyond a reasonable doubt.

Argued February 8—officially released June 15, 2021

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Hon. Samuel S. Sferrazza*, judge trial referee; judgment denying the petition; thereafter, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Appeal dismissed.*

*Robert L. O'Brien*, assigned counsel, with whom, on the brief, was *William A. Adsit*, assigned counsel, for the appellant (petitioner).

*Melissa E. Patterson*, senior assistant state's attorney, with whom, on the brief, were *Sharmese Walcott*, state's attorney, and *Michael Proto*, senior assistant

state's attorney, for the appellee (respondent).

*Opinion*

SUAREZ, J. The petitioner, Marcus Fair, appeals, following the denial of his petition for certification to appeal, from the judgment of the habeas court denying his third amended petition for a writ of habeas corpus. The petitioner claims that the habeas court abused its discretion by denying his petition for certification to appeal because he demonstrated that he was deprived of his right to the effective assistance of counsel during his underlying criminal trial. We conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal and, accordingly, dismiss the appeal.

In 2005, the petitioner was convicted, following a jury trial, of murder in violation of General Statutes (Rev. to 2003) § 53a-54a (a) and criminal possession of a firearm in violation of General Statutes (Rev. to 2003) § 53a-217 (a) (1). Following his conviction, the petitioner was sentenced by the trial court, *Espinosa, J.*, to a total effective term of sixty-five years of imprisonment. In an unsuccessful direct appeal to this court, the petitioner raised a claim of instructional impropriety and a claim that the trial court had abused its discretion in excluding evidence of prior inconsistent identification statements. *State* v. *Fair*, 104 Conn. App. 519, 522, 525, 935 A.2d 196 (2007).

The following facts, as described by this court in its decision on the petitioner's direct appeal, are relevant to this appeal. "In the late evening of January 13, 2004, Dwayne Knowlin and Joshua Mims left Knowlin's home on Nelson Street in Hartford to get something to eat. As they walked home, the [petitioner] approached. The [petitioner] wore a black mask that concealed his head; his face was visible from his lips to his eyebrows. The [petitioner] stopped in front of Knowlin and Mims, took out a black revolver and opened fire. Knowlin and Mims immediately ran. After jumping a fence and with the [petitioner] no longer in sight, Knowlin collapsed, informing Mims that he was shot. Knowlin's breathing became labored, and Mims called for an ambulance. Knowlin died that evening.[1]

"The next day, Howard Fair, the uncle of the [petitioner], heard rumblings from family members that the [petitioner] was involved in the shooting. He confronted the [petitioner], who admitted to shooting Knowlin. The [petitioner] explained that he 'had a beef' with the 'kids on Nelson Street' and alleged that they had shot at him and his cousin a month earlier. The [petitioner] told his uncle that he wanted revenge. As Howard Fair recounted, the [petitioner] stated that 'he was going to get back at them, no one in particular, just said he's gonna, you know, they shot at him so he's going to go shoot back at them.' Fearing for his nephew's safety, Howard Fair encouraged the [petitioner] to turn himself

in to the authorities. On January 16, 2004, the [petitioner] and his uncle entered the Harford [P]olice [D]epartment. At that time, Howard Fair gave a statement implicating the [petitioner] in Knowlin's death, and the [petitioner] was arrested. The police subsequently presented a photographic array to Mims, who immediately identified the [petitioner] as the shooter. At trial, Mims testified that he had known the [petitioner] for approximately five years and that he observed the [petitioner's] face 'a whole minute' before the shooting." (Footnote in original.) Id., 521–22.

We note that, in addition to the foregoing facts, which were consistent with the state's theory of the case, there was also evidence before the jury of the following facts. On the night of the shooting, the petitioner wore a yellow, green, and red hat with fake dreadlocks attached to it. As the petitioner approached Knowlin and Mims, Mims heard someone ask the petitioner if he was "Budda." Another person replied, "no, that ain't Budda, that's Blirt." As the petitioner fired the gun, he said "bumbaclot."

When the police arrived at the scene, Sylvia Hernandez, a patrol officer for the Hartford Police Department, questioned Mims about what had occurred. Mims did not initially identify the petitioner as the shooter but told Officer Hernandez that the shooter was a black male with a medium complexion. Mims repeatedly stated that the shooter was wearing a "Jamaican hat." Officer Hernandez then asked Mims if the shooter was a Hispanic, black, or Jamaican male. Mims replied that he thought the shooter was a Jamaican male. The police then transported Mims to the police station where he provided a sworn, written statement about what happened, along with a description of the shooter.

During the course of the investigation of the shooting, the police recovered a baggie containing a black powdery substance in the driveway of 8 Clay Street, close to the location where first responders found Knowlin. The police did not test the powder or the baggie, nor did they investigate who, if anyone, was in possession of the baggie at the time of the shooting.

On January 14 and 15, 2004, Detective Robert Davis of the Hartford Police Department received six voicemails from multiple anonymous persons who believed that the petitioner was involved in the shooting. On the basis of these voicemails, in which the callers included the petitioner's name and nickname, Detective Davis identified the petitioner as a suspect in the shooting.

On the evening of January 16, 2004, Howard Fair, accompanied by the petitioner, voluntarily went to the Hartford police station. Detective Davis had not made any attempt to locate the petitioner, nor did he request that the petitioner come to the police station. Detective Davis spoke to Howard Fair for approximately fifteen

or twenty minutes before Howard Fair provided Davis with a sworn, written statement implicating the petitioner in Knowlin's death.[2]

On March 16, 2011, the petitioner, as a self-represented litigant, commenced the present habeas action. On March 6, 2012, the court appointed habeas counsel. On August 13, 2015, the petitioner, through counsel, filed a third amended petition for a writ of habeas corpus. The petitioner alleged that his confinement is unlawful because the representation afforded him by his trial counsel, Robert Meredith and Michael Isko, "was not within the range of competence displayed by lawyers with ordinary training and skill," and that, "[t]here [was] a reasonable probability that 'but for' [their] errors and omissions . . . the outcome of the petitioner's trial would have been different."[3] In his posttrial brief, the petitioner focused on the allegations that his trial counsel failed (1) "to introduce all the prior inconsistent statements of Mims regarding the description of the shooter," (2) "to offer expert testimony as to Jamaican slang to impeach Mims and point to third party culpability," (3) "to offer expert testimony regarding the effects of phencyclidine (PCP), also known as 'angel dust,' as those effects bear on diminished capacity to form requisite intent and as to the reliability of the petitioner's confessions," and (4) "to demonstrate Mims' motivation to cooperate with the police and falsely identify the petitioner as the shooter."

On July 7, 2017, and August 20, 2019, the habeas court, *Hon. Samuel S. Sferrazza*, judge trial referee, presided over the habeas trial. The petitioner called two witnesses to testify, private investigator Ken Novi and Officer Hernandez. Novi testified in relevant part about the meaning of the word "bumbaclot" and stated that it was a "Jamaican slang term." He also testified that he spoke to the petitioner during his investigation and that the petitioner spoke "Americanized English" and did not speak with a Jamaican accent. The petitioner's counsel examined Officer Hernandez,[4] in relevant part, about the description that Mims provided to her on the night of the shooting. She was unable to recall the details of Mims' statement. The petitioner's counsel asked a litany of questions about the murder investigation, to which Officer Hernandez repeatedly answered that she did not remember the details of the investigation. The petitioner's counsel showed Officer Hernandez a police report that she prepared about the murder, and she testified that it did not refresh her recollection of the investigation.

On October 4, 2019, in a thorough memorandum of decision, the habeas court denied the third amended petition for a writ of habeas corpus. First, the court rejected the claim that the petitioner's trial counsel rendered deficient performance by virtue of the fact that they failed to present expert testimony concerning

the effects of PCP use in an effort to undermine the reliability of the petitioner's confession to Howard Fair.[5] The court, observing that the petitioner failed to present expert testimony of such nature during the habeas trial, concluded that the petitioner failed to demonstrate what expert testimony would have been available to his trial counsel at the time of trial and, thus, had failed to demonstrate that they had acted deficiently in failing to present such evidence.

Next, the court addressed the claim that the petitioner's trial counsel rendered deficient performance in failing to impeach Mims regarding his motivation to testify untruthfully. Specifically, the petitioner argued that his trial counsel failed to establish that Mims' identification and trial testimony was influenced by his expectation of favorable treatment by the police. This argument was related to the discovery of the baggie containing a black powder by the police, near the location where first responders found Knowlin. The court stated: "Defense counsel unsuccessfully attempted to cross-examine Mims regarding whether he expected to receive some benefit in the form of the police ignoring the discovery of a baggie containing a black powder close to the victim's body . . . . The trial judge sustained the state's objection to this line of questioning because of an insufficient nexus between Mims and the baggie to support an inference of favorable treatment by the police in exchange for Mims' identification of the petitioner as the shooter." The court further stated: "The trial judge did allow cross-examination as to whether the police inquired of Mims about the baggie. Mims testified that the police never mentioned that discovery at all. It should be recalled that at the time the baggie was seized, Mims *refused* to disclose that he knew who shot his friend. That identification came about one week later.

"No credible evidence was adduced at the habeas trial to support the petitioner's suspicion on this point. Mims conceded he withheld pertinent information from the police on the night of the homicide. The police received [evidence concerning] the petitioner's admissions a few days later without any assistance from Mims. Mims' later identification of the petitioner was not the basis for the petitioner's arrest, but simply confirmed the veracity of the petitioner's multiple admissions to the crime.

"Also, defense counsel adequately cross-examined Detective Gregory Gorr [of the Hartford Police Department] about whether the baggie or its contents were subjected to testing or further investigation. Detective Gorr acknowledged that they were not. The court finds that the petitioner has failed to prove deficient performance as to this specification of ineffective assistance." (Emphasis in original.)

Next, the court addressed the petitioner's remaining

allegations of deficient performance, all of which were related to his trial counsel's alleged failure to adequately impeach Mims with respect to aspects of his identification of the petitioner as the shooter. The court observed that the petitioner's arguments focused on the fact that, on the night of the shooting, Mims failed to identify the petitioner, described the shooter as a Jamaican male, and stated that the shooter was wearing a black mask. The petitioner also attached great significance to Mims' statement that the shooter had used the term "bumbaclot." The petitioner argued that if his trial counsel had presented evidence concerning the etymology of that term, it would have tended to cast doubt on the accuracy of the identification. The court rejected all of these arguments on the ground that, even if deficient performance was rendered by the petitioner's trial counsel, it did not prejudice the petitioner.

The court observed that, at the habeas trial, the petitioner presented evidence that the term "bumbaclot" was "a highly offensive Rastafarian insult" but that "[d]efense counsel [at the time of the criminal trial] never produced expert testimony as to its meaning or culture of origin. In other words, the jury was never informed that the term was Jamaican slang." The court stated: "At the criminal trial, Mims testified that he had heard the word previously, although he did not know its precise meaning. The petitioner argues that, had the jury known the term was Jamaican, it would have discredited Mims' identification of the petitioner, who is not Jamaican, and cast doubt on the petitioner's confession."

The court rejected that conclusion and stated: "Mims also testified that the shooter wore a . . . dreadlock wig and hat. That is, the shooter appeared to impersonate a person of Jamaican background. The use of a Jamaican insult is also consistent with Mims' testimony on that issue. Under the particular circumstances before the jury in the petitioner's case, such testimony was not unequivocally exculpatory or even significantly so."

The court further stated: "Although in his testimony Mims denied that he initially described the shooter as Jamaican, the jury heard the evidence through a police witness that he had. Mims explained that he only characterized the perpetrator's hat as Jamaican and not the person wearing it. In any event, the jury knew that Mims admitted [to] deceiving the police on the night of the shooting.

"The petitioner also tried to attach importance to the fact that Mims originally described the shooter as wearing a black mask, without modifying that description as a football type mask. The court regards that omission as trivial. . . .

"Also, Mims' description of the shooter as dressed in

black and of medium complexion carries little probative weight. Mims acknowledged trying to deceive the police about the fact [that] he knew the shooter. He admitted he failed to tell the police about the fake dreadlocks. His initial description was rather nondescript; no distinctive clothing; medium complexion.

"In his posttrial brief, the petitioner characterized Mims as the 'crux' of the state's case. This is an overstatement of Mims' role, although he was an important witness. The crux of the [prosecution's] case was the petitioner's multiple confessions to committing the crime. . . . Mims' testimony was *confirmatory* rather than *primary*.[6]

"There was no credible evidence proffered at the habeas trial that Mims was coached to [identify] the petitioner nor that Mims even knew the police had a suspect in custody when he [selected] the petitioner's photograph as the shooter from the [photographic] array 'immediately.' " (Emphasis in original; footnote added.)

On October 11, 2019, the habeas court denied the petitioner's certification to appeal. This appeal followed.[7] Additional facts and procedural history will be set forth as necessary.

We begin by setting forth the legal principles and the standard of review relevant to this claim. "Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [the] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and applicable legal principles. . . .

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by this court for determining the propriety of the habeas court's denial of the petition for certification. Absent such a showing by the petitioner, the judgment of the habeas court must be affirmed. . . .

"We examine the petitioner's underlying claim[s] of ineffective assistance of counsel in order to determine whether the habeas court abused its discretion in denying the petition for certification to appeal. Our standard

of review of a habeas court's judgment on ineffective assistance of counsel claims is well settled. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . .

"In *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong. . . .

"To satisfy the performance prong [of the *Strickland* standard] the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . In its analysis, a reviewing court may look to the performance prong or to the prejudice prong, and the petitioner's failure to prove either is fatal to a habeas petition." (Citations omitted; internal quotation marks omitted.) *Anderson* v. *Commissioner of Correction*, 201 Conn. App. 1, 11–13, 242 A.3d 107, cert. denied, 335 Conn. 983, 242 A.3d 105 (2020).

Although the petitioner argues that the court improperly rejected his claim of ineffective assistance of counsel, he has, in this appeal, narrowed the specific allegations of ineffective representation on which he relies. The petitioner focuses on his argument that his trial counsel's failure to reasonably impeach Mims' identification testimony constituted deficient performance and that, "even in the face of [the petitioner's] supposed confession, properly discrediting Mims would have suf-

ficiently undermined confidence in the verdict, such that the petitioner proved prejudice" before the habeas court. In his brief to this court, the petitioner focuses on only two claims from his third amended petition: that his trial counsel failed (1) to "utilize available evidence about the Jamaican patois word 'bumbaclot' to the advantage of the petitioner's defense" and (2) to "utilize other available evidence to support the petitioner's defense by impeaching Mims . . . ."[8] We agree with the habeas court that the petitioner failed to demonstrate that he was prejudiced by the alleged deficient performance on which he relies. Accordingly, we will not address the performance prong of the *Strickland* standard.

We first address the petitioner's contention that he was prejudiced by his trial counsel's failure to produce evidence about the word "bumbaclot." Specifically, the petitioner argues that his trial counsel failed to present evidence of the word's Jamaican origin, which could have cast doubt on whether the petitioner, who is not Jamaican, was the shooter. At the habeas trial, Novi testified about the meaning of the word "bumbaclot" and its Jamaican etymology. Novi noted that, in the neighborhood where the murder occurred, "there are a lot of Jamaican restaurants, and there are . . . people of Jamaican descent there." At the criminal trial, Mims testified that the petitioner lived in a neighborhood near the location of the murder. At the criminal trial, Mims testified that he "ha[d] no idea" what the word "bumbaclot" meant but that he had heard the word before.

We agree with the habeas court that the facts to which Novi testified were unlikely to have affected the outcome of the trial. The essence of the petitioner's argument is that Novi's testimony would have led the jury to conclude that the petitioner, who is not of Jamaican descent, would have been unlikely to have used the term "bumbaclot." The petitioner's argument seems to rest on the faulty premise that the term at issue could be used only by a person of Jamaican descent. As the habeas court observed, however, in light of the evidence presented at the criminal trial that, at the time of the shooting, the petitioner was wearing a mask, headwear described as a "Jamaican hat," and fake dreadlocks, the jury could have inferred that the petitioner had used the Jamaican term as part of an overall attempt to conceal his identity. Thus, we agree with the habeas court that, even if the jury heard testimony about the meaning and origin of the word "bumbaclot," it is unlikely that this testimony would have affected the outcome of the trial.

We next address the petitioner's contention that he was prejudiced by his trial counsel's failure to adequately impeach Mims on the basis of Mims' prior inconsistent statements concerning the shooter and his alleged desire to avoid criminal liability stemming from

the discovery by the police of the powdery substance near the location where first responders found Knowlin.[9] We begin by addressing the claim that the petitioner's trial counsel rendered ineffective assistance by failing to adequately impeach Mims with respect to his desire to avoid prosecution for the black substance. We note that during Mims' cross-examination at the criminal trial, the petitioner's counsel showed Mims a picture of the baggie and asked him to confirm that he was never charged with a crime in connection with it. The state objected to this question on relevance grounds, and, after a sidebar conference, the court directed the petitioner's counsel to rephrase the question.[10] The petitioner's counsel then asked Mims if anyone from the Hartford Police Department asked him about a substance that was found in the driveway of 8 Clay Street, to which he replied "[n]o." Shortly thereafter, the petitioner's counsel cross-examined Detective Gorr, who testified that the police did not test the baggie for fingerprints or DNA. Detective Gorr also testified that the police "didn't have any reason to believe it was related to [their] primary [crime] scene" on Nelson Street.[11] As the habeas court observed, the petitioner's trial counsel did attempt to pursue a line of inquiry related to Mims' motivation to cooperate with the police but abandoned this strategy when it became clear that the police did not connect the baggie to Mims and, therefore, that he never faced criminal liability in connection with its discovery. As the habeas court correctly observed, there simply was no credible evidence presented in support of the petitioner's theory at the criminal or habeas trials. Accordingly, the petitioner failed to demonstrate that any further inquiry into this subject by his trial counsel was likely to have affected the jury's assessment of Mims' testimony.

Additionally, the petitioner is unable to demonstrate that he was prejudiced by his trial counsel's alleged failure to impeach Mims concerning the fact that he made prior inconsistent statements to the police concerning the shooter. As the habeas court correctly observed, Mims testified at the criminal trial that, on the night of the shooting, he had deceived the police by refusing to identify the petitioner as the shooter. Thus, despite being provided with evidence that Mims was initially deceptive in terms of identifying the petitioner, the jury found the petitioner guilty of the crimes with which he was charged.

We also agree with the habeas court that the petitioner's focus on efforts made by his trial counsel to undermine the accuracy of Mims' identification of him as the shooter overlooks the fact that, independent of Mims' testimony, the state presented proof beyond a reasonable doubt of his guilt. As the habeas court aptly observed, the police had learned about the petitioner's involvement in the murder before Mims identified him as the shooter. There was evidence before the jury that

Detective Davis first learned that the petitioner was a suspect from the voicemails he received on January 14 and 15, 2004. On January 16, 2004, the petitioner voluntarily arrived at the police station with Howard Fair, who provided a statement that the petitioner had confessed to him about his role in the shooting. The jury heard ample testimony from Howard Fair about the petitioner's confession. Only after Detective Davis received these anonymous tips and Howard Fair's statement did he present Mims with a photographic array that included a photograph of the petitioner. Mims identified the petitioner from this photographic array within a matter of seconds.[12]

We agree with the habeas court that Mims' testimony was an important aspect of the state's case, yet, in light of the totality of the evidence available to the jury, we are not persuaded that the outcome of the case would have been different had the petitioner's trial counsel impeached Mims in the manner prescribed by the petitioner. Accordingly, we conclude that the petitioner failed to demonstrate that he was prejudiced by his trial counsel's performance.

For the foregoing reasons, we conclude that the petitioner has failed to demonstrate that the issues raised in his petition for certification to appeal are debatable among jurists of reason, that the court could resolve the issues in a different manner, or that the questions are adequate to deserve encouragement to proceed further. Thus, the petitioner has failed in his burden of demonstrating that the court's denial of his petition for certification to appeal reflected an abuse of discretion.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] "Harold Wayne Carver II, the state's chief medical examiner, testified that the cause of Knowlin's death was 'a gunshot wound of the chest and abdomen.'" *State* v. *Fair*, supra, 104 Conn. App. 521 n.3.

[2] The defense presented evidence, through its cross-examination of Howard Fair, that, on January 14, 2004, the petitioner was under the influence of phencyclidine (PCP) when he confessed to shooting Knowlin. Howard Fair further testified that, on January 16, 2004, the petitioner was under the influence of PCP when he was present at the Hartford police station. Howard Fair also testified that he told the police that the petitioner was under the influence of PCP both when they arrived at the police station and when the petitioner confessed to him.

[3] The petition also included a second count in which the petitioner asserted a violation of his confrontation rights under the United States constitution. In its memorandum of decision denying the petition, the habeas court stated that "the petitioner never discussed that claim in his posttrial brief, and the court regards that contention as abandoned." In the present appeal, the petitioner does not raise a claim related to that aspect of the court's ruling.

[4] Following the criminal trial, but before the habeas trial, Officer Hernandez changed her last name to McGrath. For the sake of consistency, we will continue to refer to her as Officer Hernandez.

[5] In its memorandum of decision, the court referred to the petitioner's claim that such expert testimony could have "undermined the reliability of the petitioner's *confessions* to his uncle and the police." (Emphasis added.) Later in its decision, the court referred to the fact that "[t]he crux of the prosecution case was the petitioner's *multiple confessions* to committing the crime." (Emphasis added.) We note that there was no evidence before the jury that the petitioner provided the police with a confession. Although,

during the criminal trial, the court denied the petitioner's motion to suppress statements that he had made in the presence of law enforcement, the state did not introduce any such statements in evidence. As we have explained, however, the jury had before it evidence of the petitioner's confession to his uncle, Howard Fair. We are not persuaded that this inaccuracy in the court's decision undermines its analysis.

[6] We interpret the court's description in this regard to reflect its belief that Mims' testimony helped to establish the certainty of what was shown by *other* inculpatory evidence that was presented by the state at the criminal trial, including the evidence of the petitioner's confession to Howard Fair.

[7] In his petition for certification to appeal, the petitioner stated that the grounds on which he proposed to appeal were related to the habeas court's errors in (1) "denying the petitioner's claims," (2) "the assessment of prejudice," (3) "its findings," and (4) "its application of the law." He also stated that these grounds included "any issues which are unearthed after a thorough review by appellate counsel."

[8] The petitioner does not raise a claim of error related to the habeas court's rejection of his claim of ineffective assistance as it relates to expert testimony concerning PCP.

We note that the petitioner also argues that he "litigated, but did not brief or argue," a claim that his trial counsel was ineffective for failing to object on hearsay grounds to Howard Fair's testimony about the rumors he heard about the petitioner's involvement in the murder. He contends, "[n]evertheless, that [this] issue is relevant to this court's prejudice inquiry." The petitioner raised an argument of this nature in his third amended petition. He did not, however, discuss the claim in his posttrial brief, and the habeas court did not address the claim in its memorandum of decision. Accordingly, we cannot review the claim. See *Henderson* v. *Commissioner of Correction*, 129 Conn. App. 188, 198, 19 A.3d 705 ("[a] reviewing court will not consider claims not raised in the habeas petition or decided by the habeas court"), cert. denied, 303 Conn. 901, 31 A.3d 1177 (2011).

[9] The petitioner has not pointed to anything in the record that supports his assertion that Mims had a motive to cooperate with the police or even that Mims could have faced criminal liability in connection with the baggie of black powder that the police discovered.

[10] The court stated: "The question will be . . . did the police ask you about any substances that were found that day."

[11] The evidence reflects that Knowlin was shot in front of 20 Nelson Street, which was the primary crime scene. He then ran with Mims and collapsed near 8 Clay Street, which is where the baggie was found.

[12] The habeas court stated: "There was no credible evidence proffered at the habeas trial that Mims was coached to [identify] the petitioner nor that Mims even knew the police had a suspect in custody when he [selected] the petitioner's photograph as the shooter from the [photographic] array 'immediately.'"