******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# ANIBAL BOBE *v.* COMMISSIONER
# OF CORRECTION
# (AC 46765)

Cradle, C. J., and Westbrook and Harper, Js.

*Syllabus*

The petitioner, who previously had been convicted of, inter alia, sexual assault in the second degree, appealed following the denial of his petition for certification to appeal from the habeas court's judgment denying his habeas petition. He claimed, inter alia, that the court erred in concluding that his criminal trial counsel did not provide ineffective assistance. *Held*:

The habeas court did not abuse its discretion in denying the petition for certification to appeal because the petitioner failed to demonstrate that his claims involved issues that were debatable among jurists of reason, that a court could have resolved the issues in a different manner, or that the questions were adequate to deserve encouragement to proceed further.

The petitioner's claim that the habeas court abused its discretion and violated his due process rights under the federal and state constitutions by denying his motion for a continuance of the habeas trial was unavailing, as the petitioner's counsel acquiesced to the court's stated expectation that the trial would conclude if counsel was unable to offer assurances that he had other witnesses under subpoena for the scheduled second day of trial, the lone reference the petitioner's counsel made to the court prior to the commencement of trial regarding the motion pertained to the court's stated concerns about the age of the case rather than to the presentation of witness testimony, the written motion was undisputedly silent regarding the need for more time to subpoena additional witnesses, and the reasons advanced by the petitioner's counsel in support of the motion were speculative in nature.

The habeas court properly concluded that the petitioner failed to establish his claim of ineffective assistance of criminal trial counsel, as he failed to present sufficient evidence to overcome the presumption that his trial counsel's decision to predicate the defense on the fact that the petitioner had tested positive for human immunodeficiency virus and the victim had not was sound trial strategy.

Argued April 21, 2025—officially released January 13, 2026

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Newson, J.*; judgment denying the petition; thereafter, the court, *Newson, J.*, denied

the petition for certification to appeal, and the petitioner appealed to this court. *Appeal dismissed.*

*J. Patten Brown III*, assigned counsel, for the appellant (petitioner).

*Olivia M. Hally*, deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

HARPER, J. The petitioner, Anibal Bobe, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his third revised amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the court (1) abused its discretion in denying his petition for certification to appeal, (2) abused its discretion and denied him his "basic constitutional right to present witnesses at trial," in violation of due process of law, when it denied his motion for a continuance of the habeas trial, and (3) improperly concluded that he had failed to prove ineffective assistance of his criminal trial counsel.[1] We conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal, and, therefore, we dismiss the appeal.

The following facts, as set forth by this court in the petitioner's direct appeal from his criminal conviction, and procedural history are relevant to the petitioner's claims on appeal. "In July, 2012, the . . . victim, then fourteen years old,[2] and his family were homeless. The victim's mother was acquainted with the [petitioner], who allowed them to live in his one bedroom apartment with him. The [petitioner] helped his landlord with building maintenance and had access to the building's attic and vacant apartments in the building that required work.

[1] For ease of discussion, we address the petitioner's claims in a different order than they are presented in his appellate brief.

[2] In accordance with our policy of protecting the privacy interests of the victims of sexual assault and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity can be ascertained. See General Statutes § 54-86e.

The [petitioner] asked the victim's mother if the victim could help him paint a neighboring vacant apartment. That apartment had painting mats down on the floor. The [petitioner] provided the victim with a brown bottle of liquor that the victim described as '[tasting] horrible.'[3] The [petitioner] and the victim took off each other's clothes. The victim put his mouth on the [petitioner's] penis and performed oral sex until the [petitioner] ejaculated on the floor, and the [petitioner] did the same to the victim.

"On another occasion, the [petitioner] invited the victim to come up to the attic, where there was a bed, to have 'sweaty sex.' The victim went into the attic with the [petitioner], and they took off each other's clothes and performed oral sex on each other. The [petitioner] 'put the tip of his [penis] in [the victim's anus], but it didn't go all the way in because [the victim] . . . clenched up . . . and . . . [pushed] away because it . . . [hurt].' Another time in the vacant apartment, the [petitioner] asked the victim to 'turn over so that he [could] stick it in.' The victim did not want to engage in anal sex, but the [petitioner] told him that '[it was] ok' and fully penetrated the victim's anus. The victim described it as a 'painful,' 'awful feeling.' The victim stated that when the [petitioner] finished it felt like the [petitioner] had '[ejaculated] inside [of him].' The [petitioner] never used a condom during any of the assaults. Afterward, the victim went to the bathroom and saw blood in his underwear. The victim told the [petitioner], but the [petitioner] 'tried to deny it and say that . . . it wasn't blood.' The victim was scared, and he threw away the bloody underwear.

"The victim engaged in oral sex with the [petitioner] approximately two other times, and the [petitioner] attempted to engage in anal sex with the victim on one other occasion. The [petitioner] told the victim multiple times 'not to tell anyone because [they] would both get in

---

[3] "The [petitioner] provided the victim with alcohol on two other occasions." *State* v. *Bobe*, 179 Conn. App. 878, 880 n.2, 181 A.3d 602, cert. denied, 328 Conn. 920, 180 A.3d 964 (2018).

trouble.' Initially, the victim did not tell anyone about the assaults because he 'was scared and . . . [did not] know what was going to happen' or 'what anybody would think.' The victim was 'very concerned' about whether his family would be able to stay in the [petitioner's] apartment. Later that month, the landlord discovered that the victim's family was living in the [petitioner's] apartment and asked them to leave. In the spring of 2013, the victim told his stepbrother the [petitioner's] name and 'exactly what happened from the beginning . . . to the end.' The victim then told his father and stepmother, who contacted the Bridgeport Police Department. The state subsequently charged the [petitioner] with sexual assault in the second degree, and two counts of risk of injury to a child. A three day jury trial commenced on July 6, 2016, at which the victim testified. The victim's testimony was corroborated by his stepbrother's constancy of accusation testimony.

\*\*\*

"On July 8, 2016, the jury returned a verdict of guilty as to all charges and, thereafter, the [petitioner] was convicted and sentenced to a total effective sentence of thirty-five years of incarceration, execution suspended after seventeen years, followed by thirty years of probation." (Footnote added; footnote in original.) *State* v. *Bobe*, 179 Conn. App. 878, 880–83, 181 A.3d 602, cert. denied, 328 Conn. 920, 180 A.3d 964 (2018). This court affirmed the judgment of conviction on direct appeal. Id., 885.

On May 25, 2017, the petitioner, acting as a self-represented party, filed a petition for a writ of habeas corpus. Counsel was appointed in August, 2017. On January 7, 2020, the petitioner filed the operative third revised amended petition for a writ of habeas corpus (amended petition). The petitioner claimed in the amended petition that his criminal defense counsel, Arthur Ledford, had provided ineffective assistance during his underlying criminal trial and that the trial court had violated his due process rights at sentencing. In the meantime, the

parties had entered into a scheduling order that provided that the habeas trial would begin on July 20, 2020.

On June 20, 2020, the petitioner filed a motion to continue the July 20, 2020 trial "until a time when in-person habeas trials can be safely resumed." He stated in that motion that "[t]he COVID-19 pandemic has severely hindered counsel's ability to prepare for this trial" and that "the mechanics of holding the trial by video will be especially complicated in this matter since the petitioner will need the services of an interpreter, and the nature of some of the claims will require that counsel have the ability to consult with the petitioner during the hearing." The court, *Oliver, J.*, granted the petitioner's motion, and, on August 18, 2020, the parties entered into a new scheduling order that set April 24 and 25, 2023, as the dates for trial.

On April 12, 2023, the petitioner filed a witness list that identified fourteen witnesses he "may call" at trial.[4] Five days later, on April 17, 2023, the petitioner filed a motion to continue the habeas trial, which the court, *Newson, J.*, denied.

The court held the habeas trial on April 24, 2023, and the petitioner pursued his claim that Ledford had provided ineffective assistance during his underlying criminal trial on the basis of nineteen alleged deficiencies, as well as his claim that the trial court had violated his due process rights at sentencing. The court heard testimony from two witnesses, Ledford and the petitioner, and several exhibits were admitted into evidence. Thereafter, the habeas court denied all of the petitioner's claims. The petitioner filed a petition for certification to appeal the denial of his amended petition,[5] which the court denied.

---

[4] In his principal appellate brief, the petitioner states that there were thirteen witnesses listed on his witness list. The witness list, however, names fourteen witnesses.

[5] As grounds for his petition for certification to appeal, the petitioner claimed that the habeas court erred in, inter alia, "denying [his] request for a continuance of the habeas trial" and "its reasoning and conclusion that [his] trial counsel did not provide constitutionally deficient performance."

This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

We first address the petitioner's claim that the court abused its discretion in denying his petition for certification to appeal. We disagree.

General Statutes § 52-470 (g) provides: "No appeal from the judgment rendered in a habeas corpus proceeding brought by or on behalf of a person who has been convicted of a crime in order to obtain such person's release may be taken unless the appellant, within ten days after the case is decided, petitions the judge before whom the case was tried or, if such judge is unavailable, a judge of the Superior Court designated by the Chief Court Administrator, to certify that a question is involved in the decision which ought to be reviewed by the court having jurisdiction and the judge so certifies."

It is well established that, when "[f]aced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [a] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and applicable legal principles. . . . If the petitioner succeeds in surmounting that hurdle, the petitioner must then demonstrate that the judgment of the habeas court should be reversed on its merits. . . . *Crespo* v. *Commissioner of Correction*, 292 Conn. 804, 811, 975 A.2d 42 (2009); see also *Simms* v. *Warden*, 230 Conn. 608, 615–16, 646 A.2d 126 (1994) (adopting factors identified by United States Supreme Court in *Lozada* v. *Deeds*, 498 U.S. 430, 431–32, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991), as appropriate standard for

determining whether habeas court abused its discretion in denying certification to appeal).

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by [our Supreme Court] for determining the propriety of the habeas court's denial of the petition for certification. . . . *Villafane* v. *Commissioner of Correction*, 190 Conn. App. 566, 573, 211 A.3d 72, cert. denied, 333 Conn. 902, 215 A.3d 160 (2019)." (Internal quotation marks omitted.) *Owen* v. *Commissioner of Correction*, 234 Conn. App. 481, 489–90, 344 A.3d 158, cert. denied, 353 Conn. 923, 345 A.3d 812 (2025).

For the reasons set forth in parts II and III of this opinion, we conclude that the petitioner has failed to demonstrate that (1) his claims involve issues that are debatable among jurists of reason, (2) a court could resolve the issues in a different manner, or (3) the questions are adequate to deserve encouragement to proceed further. See *Villafane* v. *Commissioner of Correction*, supra, 190 Conn. App. 572. Thus, we conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal.

II

We now turn to the petitioner's claim that the habeas court abused its discretion and violated his due process rights under the federal and state constitutions by denying his motion to continue the habeas trial. We are not persuaded.

The following additional facts and procedural history are relevant to our resolution of this claim. In the petitioner's April 17, 2023 motion for a continuance of the

habeas trial, his counsel stated that he had been representing the petitioner in this matter since 2018 and that the original July, 2020 trial date had been continued to April 24 and 25, 2023. He explained in the motion that he was requesting another continuance for the following reasons:

"First, the petitioner was released onto parole in the last few weeks[6] and the undersigned counsel has had several discussions with the petitioner about his case that have led the undersigned counsel to the conclusion that additional time to work with the petitioner on the case would be beneficial to the petitioner and could either simplify or resolve the matter completely. Second, the undersigned counsel experienced the death of his mother in March after nearly six months of a very difficult illness. The undersigned counsel maintained his practice during this time and was counsel in several jury trials and a handful of habeas trials. However, preparations for the petitioner's habeas trial [were] impacted by the realities of managing the personal crisis. While the petitioner has witnesses under subpoena and his exhibits prepared, the undersigned counsel feels compelled to make this request in order to assure that the petitioner is receiving the effective assistance of counsel. For example, the petitioner recently clarified some information that had likely been conveyed to the undersigned some time ago and the undersigned counsel is concerned that he will not have sufficient time to adequately prepare the issue now that he has a fuller understanding of the facts." (Footnote added.)

In an order issued that same day, the court, *Newson, J.*, ruled that "[t]he motion to continue the trial in this matter, which refers vaguely to 'issues' and 'information'

---

[6] "[I]t is well established in . . . Connecticut jurisprudence that individuals who are on . . . parole satisfy the custody requirement necessary to invoke the jurisdiction of the habeas court." (Footnote omitted.) *Riccio* v. *Commissioner of Correction*, 235 Conn. App. 431, 438–39, 344 A.3d 1212, cert. granted, 353 Conn. 935, ___ A.3d ___ (2025).

that need looking into is DENIED." The petitioner did not file a motion to reargue the court's decision.

At the beginning of the habeas trial on April 24, 2023, the court asked, "Is there anything procedurally or administratively we need to address before we get started, exhibits, et cetera?" After both counsel confirmed that there had been an agreement regarding exhibits, the following colloquy between the court and the petitioner's counsel ensued:

"The Court: Okay. Anything else before we proceed?

"[The Petitioner's Counsel]: And I guess the only other thing is we're scheduled for today and tomorrow. Today, I only have trial counsel and the petitioner. I have the investigator trying to track down some of these other witnesses who have not been cooperative, so I guess I can report to the court then, but I think we might be done today.

"The Court: Well, are they under subpoena?

"[The Petitioner's Counsel]: Not in hand. No.

"The Court: So, we have the petitioner and Attorney Ledford?

"[The Petitioner's Counsel]: Yes.

"The Court: So, you've got fourteen witnesses . . . on the witness list, and you're just telling the court as of right now none of these other lay witnesses or professional witnesses are actually under subpoena as we sit here today?

"[The Petitioner's Counsel]: The first three are the keepers of the records—records were delivered to me that are identical to what's in the record already. So, those three record keepers, they're on the witness list but I'm not pursuing those. [Stacy Andriolas][7] was out of the country. She's returning today. She hasn't been

[7] The petitioner's counsel initially stated that it was another listed witness who was out of the country but later clarified that he meant Andriolas. Although she was referred to as "Andriola" throughout the

served. Some of these other individuals have either been unhelpful, unavailable, or potentially could be deceased since the last time we were preparing for this trial before COVID started . . . .

"The Court: . . . [S]o, as we stand here right now, who is ready to testify?

"[The Petitioner's Counsel]: Attorney Ledford . . . [a]nd the petitioner. . . .

"The Court: And that's it?

"[The Petitioner's Counsel]: Yes, that will likely conclude the evidence. . . .

"The Court: Okay. Well, we'll address the specifics afterward, but [counsel], this is a six year old case which was scheduled for trial once. So, it sounded like you first said to me, well, I don't have anybody else under subpoena, but we'll show up tomorrow and see what happens.

"[The Petitioner's Counsel]: So, [Andriolas] talked on the telephone to . . . our investigator . . . . She was out of the country, returning today. . . . As far as [witnesses six] seven and eight, they have not been cooperative with us for reasons that are probably obvious . . . .

"The Court: Okay. The case is six years old. So, you haven't been able to get them under subpoena or find out where they are to serve them? And, I guess with [Andriolas], she's been out of the country since when to your knowledge?

"[The Petitioner's Counsel]: I don't know, Your Honor.

"The Court: Okay. So . . . we'll conclude with these two witnesses today, but counsel, what you're really telling me is you don't, I mean, you don't actually have any other witnesses to present. So . . . in trying to be fair . . . we're not going to conclude today, continue the thing tomorrow without any actual information that you have witnesses under subpoena who are bound to appear, only

habeas proceedings, the record reflects that the proper spelling of her last name is "Andriolas."

to show up tomorrow to say, the witnesses that I don't have under subpoena aren't here.

"And so, I guess what I'm saying . . . [is] unless the court can get some assurances from you that you've actually gotten proper service on witnesses and that there would be some reason for the court to convene tomorrow, such as to hold a hearing on whether or not there probably should be a capias or something issued.

"[The Petitioner's Counsel]: So, my expectation was to touch base with the investigator at the break. If there's no . . . information that there's actually going to be witnesses here, I plan to conclude today. As far as the court's questions about the age of the case, I could give a more detailed explanation of that if you'd like. I did file a motion for a continuance, and I can give you more detail on that if you'd like, Your Honor . . . it's up to the court.

"The Court: Okay. Let's get started." (Footnote added.)

Thereafter, Ledford and the petitioner testified. After their testimony concluded, the court inquired as to whether there were "any additional witnesses from the petitioner?" The petitioner's counsel responded that he did not have any additional witnesses at that time and that "I expect to rest, but maybe I could have the lunch hour to confirm that with my investigator." The court agreed to recess until 2 p.m. and stated that it expected that, when the proceedings resumed, the petitioner "either has some actual confirmation that there are witnesses under process to be here tomorrow or we proceed with closing arguments at 2 p.m."

Following the recess, the petitioner's counsel advised that "[t]he petitioner is prepared to rest at this point. Talking to [the petitioner], talking to my investigator, I think it's best to just argue and wrap up based on what Attorney Ledford [testified to] and what the record reflects."[8] The respondent, the Commissioner of Correction, rested as well, and the court heard closing

---

[8] In addition to hearing witness testimony, the court had admitted several exhibits, including transcripts from the underlying criminal

arguments. The court thereafter rendered judgment denying the amended petition in a May 25, 2023 memorandum of decision.

In this appeal, citing to the fourteenth amendment to the United States constitution and article first, §8, of the Connecticut constitution,[9] the petitioner claims that, "[u]nder the facts and circumstances of this case, the petitioner's due process rights were violated when the . . . court abused its discretion by denying the request for a continuance." He argues that this denial deprived him of his "basic constitutional right to present witnesses at trial . . . ."

We begin our analysis by setting forth our standard of review and relevant legal principles. The United States Supreme Court has long recognized that "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary . . . is a fundamental element of due process of law." *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); see also *State* v. *Stephanie U.*, 206 Conn. App. 754, 793, 261 A.3d 748 (2021) (right to present witnesses and evidence is fundamental right that is essential to fair trial), cert. denied, 343 Conn. 903, 272 A.3d 1126 (2022), and cert. denied, 343 Conn. 904, 272 A.3d 1127 (2022). "Although [a] reviewing court ordinarily analyzes a denial of a continuance in terms of whether the court

proceeding, the arrest warrant affidavit and the petitioner's medical records.

[9] The fourteenth amendment to the United States constitution provides in relevant part that no state shall "deprive any person of life, liberty, or property, without due process of law . . . ."

Article first, §8, of the Connecticut constitution provides in relevant part that, "[i]n all criminal prosecutions, the accused shall have a right to be heard . . . to be confronted by the witnesses against him; [and] to have compulsory process to obtain witnesses in his behalf . . . . No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

The petitioner does not, however, include a separate state constitutional analysis in his brief, and, thus, he has abandoned any separate claim he may have had under our state constitution. See *State* v. *Lueders*, 225 Conn. App. 612, 634 n.21, 317 A.3d 69, cert. denied, 349 Conn. 920, 321 A.3d 402 (2024).

has abused its discretion . . . [t]his is so where the denial is not directly linked to a specific constitutional right. . . . If . . . the denial of a continuance is directly linked to the deprivation of a specific constitutional right, some courts analyze the denial in terms of whether there has been a denial of [such right]." (Internal quotation marks omitted.) *Davis* v. *Commissioner of Correction*, 225 Conn. App. 263, 273–74, 315 A.3d 426, cert. denied, 349 Conn. 917, 316 A.3d 741 (2024).

In the present case, even though the petitioner "couches his claim on appeal in terms of a denial of his constitutional right [to present witnesses at trial],[10] we will review the trial court's refusal to grant a continuance for an abuse of discretion. Even if the denial of a motion for a continuance . . . can be directly linked to a claim of a denial of a specific constitutional right, if the reasons given for the continuance do not support any interference with the specific constitutional right, the court's analysis will revolve around whether the

---

[10] We note that the petitioner argues, in his reply brief, that the "thesis of [his] claim is the violation of his more fundamental right to competent assistance of counsel under *Strickland* [v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] and its progeny." The petitioner expressly argued in his principal brief to this court, however, that he "had a basic constitutional right to present witnesses at trial, which the court violated when it denied [his] motion for continuance" and that the court "denied the petitioner's request to produce crucial witnesses in contravention to his right to present relevant evidence and argument." See, e.g., *State* v. *Jose G.*, 102 Conn. App. 748, 755, 929 A.2d 324 (2007) ("It is a well established principle that arguments cannot be raised for the first time in a reply brief. . . . Claims of error by an appellant must be raised in his original brief . . . so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument." (Internal quotation marks omitted.)), aff'd, 290 Conn. 331, 963 A.2d 42 (2009). Although the petitioner explained in his principal brief that, without these witnesses, he was left with "no evidence to present in support of sixteen out of nineteen claims" and that, consequently, "[h]e could not realistically assert [that] his right to effective assistance of trial counsel was violated," the predicate for his claim on appeal is that the court prevented his efforts to present additional witnesses at the habeas trial by denying his motion for a continuance, and that is the lens through which we view his claim.

trial court abused its discretion. . . . In other words, the constitutional right alleged to have been violated must be shown, not merely alleged. . . .

"The determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. . . .

"A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made. . . . To prove an abuse of discretion, an appellant must show that the trial court's denial of a request for a continuance was arbitrary. . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. . . . In the event that the trial court acted unreasonably in denying a continuance, the reviewing court must also engage in harmless error analysis. . . .

"Among the factors that may enter into the court's exercise of discretion in considering a request for a continuance are the timeliness of the request for continuance; the likely length of the delay; the age and complexity of the case; the granting of other continuances in the past; the impact of delay on the litigants, witnesses, opposing counsel and the court; the perceived legitimacy of the reasons proffered in support of the request; the [movant's] personal responsibility for the timing of the request; [and] the likelihood that the denial would substantially impair the [movant's] ability to defend himself . . . .

"Lastly, we emphasize that an appellate court should limit its assessment of the reasonableness of the trial court's exercise of its discretion to a consideration of those factors, on the record, that were presented to the trial court, or of which that court was aware, at the time of its ruling on the motion for a continuance." (Citations

omitted; footnote added; internal quotation marks omitted.) *State* v. *Stephenson*, 181 Conn. App. 614, 629–31, 187 A.3d 528, cert. denied, 330 Conn. 908, 192 A.3d 427 (2018).

In the present case, the petitioner concedes in his reply brief that his "written motion for continuance is silent regarding needing more time to subpoena additional witnesses." He claims, however, that it was during the habeas proceeding, on April 24, 2023, when the court abused its discretion and thwarted his efforts to present additional witnesses at trial. He argues that, on that date, the "habeas court denied [his] oral request to argue more details about the motion to continue" he had filed one week earlier. Moreover, he posits that the court "denied his request even to present [Andriolas] on the following day, stating that, unless there was more concrete information regarding subpoenaed witnesses, the matter would conclude after the testimony of the two present witnesses" and that, "[e]ven though the trial was scheduled for April 24 and [25, 2023], the court did [not] allow the petitioner the opportunity to use his second day of trial to summon any more witnesses."

Stated simply, we do not agree with the petitioner's characterization of the record, particularly with respect to what he says transpired at the habeas trial. In his motion for a continuance, the petitioner's counsel represented that he had "witnesses under subpoena and his exhibits prepared . . . ." When the petitioner's counsel appeared for the first scheduled day of the habeas trial, only two of the fourteen witnesses he had listed on his witness list were present and ready to testify. None of the other witnesses, including Andriolas, had been subpoenaed, and, although the petitioner's counsel advised the court that he had his "investigator trying to track down some of these other witnesses who have not been cooperative," he volunteered that, ultimately, "we might be done [with the trial] today."

The court expressed concerns that, despite the age of the case, counsel had not been able to subpoena other

witnesses but explained that, if the petitioner's counsel could provide "some assurances . . . that [he had] actually gotten proper service on witnesses and that there would be some reason for the court to convene" the following day, it would, in fact, do so. At that point, the petitioner's counsel indicated that his "expectation was to touch base with the investigator at the break. *If there's no . . . information that there's actually going to be witnesses here, I plan to conclude today*." **(**Emphasis added.**)** The petitioner's counsel then shifted his focus to "the court's questions about the age of the case" and offered to "give a more detailed explanation of that if you'd like. I did file a motion for continuance, and I can give you more detail on that if you'd like . . . it's up to the court." The court proceeded with the trial at that point.

After the petitioner's two available witnesses testified, the court recessed and afforded the petitioner's counsel time to confer with his investigator for the express purpose of ascertaining whether any additional witnesses had been served with "process to be here tomorrow . . . ." Following that recess, the petitioner's counsel advised that, after having spoken with the petitioner and his investigator, he thought it was "best to just argue and wrap up based on what Attorney Ledford [testified to] and what the record reflects," so he rested the petitioner's case. At no time prior to doing so did the petitioner's counsel voice concerns about, let alone object to, concluding without calling any other witnesses to testify at trial. Although the petitioner's counsel advised the court that Andriolas had just returned to the country and that his investigator had spoken with her by phone, he did not request that he be allowed to call her as a witness "the following day," as he claims. Instead, our review of the record reflects that the petitioner's counsel did not object to the court's stated expectation that the trial would conclude after the break if he was not able to offer assurances that he had any other witnesses under subpoena for the following day; in fact, the record confirms that the petitioner's counsel acquiesced to it. See, e.g., *No. 2 Fraser Place Condominium Assn., Inc.* v. *Mathis*, 225 Conn. App.

534, 547, 316 A.3d 813 ("[w]e repeatedly have held that [a] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one" (internal quotation marks omitted)), cert. denied, 350 Conn. 905, 323 A.3d 342 (2024).

Finally, the lone reference the petitioner's counsel made to the court prior to the commencement of the trial about the motion for a continuance pertained to the court's stated concerns about the age of the case, not the presentation of witness testimony. See id. The court simply was not made aware, during the proceedings on April 24, 2023, that the petitioner wished to present any other witnesses besides Ledford and himself, let alone that he was seeking a continuance of the trial for this purpose.

For these reasons, our review of the petitioner's claim that the court abused its discretion when it denied his motion for a continuance is predicated on the petitioner's written motion for a continuance, which is undisputedly "silent regarding needing more time to subpoena additional witnesses," and the court's ruling thereon. See *State* v. *Stephenson*, supra, 181 Conn. App. 629–31. As grounds for the motion, the petitioner's counsel stated that "the petitioner recently clarified some information that had likely been conveyed to the [petitioner's] counsel some time ago and the [petitioner's] counsel is concerned that he will not have sufficient time to adequately prepare the issue now that he has a fuller understanding of the facts." In requesting that the habeas trial be "continued to another available date later in 2023," the petitioner's counsel also explained that his mother had died "in March," following a six month illness, but that that he had maintained his practice and was counsel in "several jury trials and a handful of habeas trials" during that time. Nonetheless, he indicated that "preparations for the petitioner's habeas trial [were] impacted by the realities of managing the personal crisis."

After considering the reasons the petitioner proffered in his motion for a continuance, the court denied it. The

court found that the motion "refers vaguely to 'issues' and 'information' that need looking into," and it declined to continue the trial. In other words, the court denied the petitioner's motion because the reasons the petitioner proffered in support of his request for a continuance were speculative.

Our Supreme Court has held that "a trial court does not act arbitrarily or unreasonably when it denies a motion for a continuance that is supported by mere speculation." *State* v. *Delgado*, 261 Conn. 708, 714–15, 805 A.2d 705 (2002). The petitioner's counsel confirmed in the motion for a continuance that he had been representing the petitioner since 2018 and that the trial had already been continued once before, in 2020, at which time "the currently set dates" he was seeking to continue had been selected. He was, nonetheless, requesting a continuance in order to address "information" he admittedly had been provided "some time ago" but had only just "recently clarified," and he was concerned that he would not have enough time to "prepare the issue . . . ." Without specificity as to what the "information" and the "issue" to which the information related were, it was impossible for the court to assess the propriety of the request of the petitioner's counsel and to determine whether a continuance was reasonable under the circumstances. Indeed, the request of the petitioner's counsel for more time to grapple with old information, made one week before a trial date that had been established more than two years earlier, appears, on its face, to be untimely. See *State* v. *Walker*, 215 Conn. 1, 10, 574 A.2d 188 (1990) (it is "well within" court's discretion to deny "patently tardy" request for continuance). The bald, nonspecific references set forth in the petitioner's motion offered nothing to explain this delinquency, let alone something that might have served to excuse it.

To this end, we acknowledge that the petitioner's counsel indicated that his mother had been ill for several months and that she had died sometime "in March," which was the month preceding the filing of the April 17,

2023 motion. We also note, however, that the petitioner's counsel confirmed that he "maintained his practice" and, in fact, served as counsel in several trials during that time. It was the preparation by the petitioner's counsel for this particular habeas trial that "was impacted by the realities of managing the personal crisis." Although we are sympathetic to the distress and impediments that such circumstances may have on family members and loved ones, and we readily acknowledge that such circumstances may sometimes present reasonable grounds for the granting of a continuance, the fact remains that, in the present case, the petitioner's counsel offered no specificity as to what "the realities" were and how they "impacted" his ability to work on this case among all others. Indeed, he did not even expressly state, until just prior to trial, that his inability to clarify old "information," and the need for more time to "prepare the [related] issue," had anything to do with "the personal crisis."

A court's consideration of a request for a continuance is necessarily informed by the facts and circumstances of each individual case and the reasons presented for the request. See *State* v. *Stephenson*, supra, 181 Conn. App. 629–31. We conclude that the speculative nature of the reasons advanced by the petitioner's counsel in support of the motion for a continuance in the present case gave the habeas court no reason to grant the motion. See *State* v. *Delgado*, supra, 261 Conn. 714–15; *State* v. *Davis*, 135 Conn. App. 385, 395–96, 42 A.3d 446, cert. denied, 305 Conn. 916, 46 A.3d 171 (2012). As such, with respect to the petitioner's claim that the habeas court acted unreasonably in denying his motion for a continuance, we conclude that he has failed to demonstrate that his claim involves an issue that is debatable among jurists of reason, could be resolved in a different manner, or deserves encouragement to proceed further.

## III

Finally, we address the petitioner's claim that the habeas court improperly concluded that he failed to prove that Ledford rendered ineffective assistance at

his criminal trial. Abandoning all but one of the nineteen bases he presented to the habeas court as support for this claim,[11] the petitioner argues on appeal that Ledford was ineffective solely because he "present[ed] an inflammatory and prejudicial defense" on his behalf by offering evidence that the petitioner had tested positive for human immunodeficiency virus (HIV) "in a case in which the petitioner was accused of homosexual child sexual assault." The respondent counters that the habeas court properly concluded that the petitioner failed to establish his claim of ineffective assistance of criminal trial counsel. We agree with the respondent.

The following additional facts and procedural history are relevant to our resolution of this claim. Ledford's theory of defense at the criminal trial was based on the premise that, because the petitioner was HIV positive and the victim was not, the victim's claim that the petitioner had unprotected sex with him on numerous occasions was doubtful. This theory was based on Ledford's "understanding [that] there would be a good chance that [the victim] would've become HIV positive" if what the victim was claiming was true. Ledford described it as a "sort of commonsense" theory.

Ledford testified that, at the time he represented the petitioner, he had thirteen or fourteen years of experience as a criminal practitioner and that he had handled approximately four or five direct sexual assault cases during that time. He explained that he had met with the petitioner many times before the trial, that the petitioner consistently maintained that the allegations against him were untrue, and that the petitioner had rejected two plea offers and insisted on going to trial.

In preparation for the trial, Ledford and his investigator, Eric Eichler, attempted to procure from the petitioner "names and addresses—things we needed to investigate, things we needed to look into," and

---

[11] See, e.g., *Joseph* v. *Commissioner of Correction*, 153 Conn. App. 570, 574, 102 A.3d 714 (2014) (deeming claims not briefed on appeal to be abandoned), cert. denied, 315 Conn. 911, 106 A.3d 304 (2015).

"[e]verything that [the petitioner] gave was really vague." For example, the petitioner told Ledford and Eichler that they needed to investigate "the old man with the eyes, and he's down by the beach." As Ledford understood it, the petitioner was claiming that this man was sexually assaulting the victim. The petitioner also discussed "certain people" with Ledford, but "he couldn't name them, didn't know where they lived." Even so, Ledford and his investigator made efforts to find out what they could with the limited information they had. In fact, Eichler went to the beach to try to find "the old man with the eyes," but he was unsuccessful.

Ledford testified that the theory of defense he ultimately pursued materialized from his own review of the police reports and the records that he had, which revealed that the victim was not HIV positive. When it "came out that [the petitioner] was HIV positive," and Ledford considered the victim's claims that he and the petitioner had had unprotected sex multiple times, he thought "there would be a good chance that [the victim] would've become HIV positive [as well] and, thus, creating a defense."

Ledford also testified that, prior to trial, he had considered pursuing a third-party culpability defense related to the victim's brother, who also had been charged with sexually assaulting both his younger sister and the victim. The petitioner, however, had been having a consensual sexual relationship with the victim's brother, who was then an adult, and the victim's brother also had been included on the state's witness list. Ledford stated that, even though the petitioner's relationship with the victim's brother was consensual, the victim's brother was going to testify that "he'd been groomed" by the petitioner.[12] Ledford believed, therefore, that the collective testimony of the victim's brother and the victim would demonstrate a pattern by the petitioner of

---

[12] Ledford explained that grooming is a "process. It's befriending [children], maybe giving them alcohol, getting them things—ready to be more open to a relationship and, eventually, sexual intercourse."

grooming younger boys because it would have established that the petitioner bought each of them alcohol, had taken each of them on walks and had spent time alone with each of them. As such, although he was "ready to start to go down that road," when the prosecutor decided not to call the victim's brother as a witness, Ledford decided not to call him either. He was concerned that, if he pursued the third-party culpability defense, the "grooming evidence" that would invariably be presented to the jury if the victim's brother testified would be very damaging to the petitioner's case. Thus, the "HIV [defense] was what [he] had left." Ledford thought it "was probably the clearer path, and, strategically, that's the one I thought was the best to go with," so that is the defense he pursued.

In so doing, Ledford reviewed the petitioner's medical records, and he consulted with and called one of the petitioner's treating physicians, Karin Michels-Ashwood, to testify at trial. Michels-Ashwood, who testified as an expert witness, stated that the petitioner was HIV positive and that it was more probable than not that the HIV would have been transferred to the victim if the petitioner had had unprotected sex with him. Although Ledford acknowledged that there was not a 100 percent chance of transmittal from unprotected sex, he "thought there was a good likelihood and enough to create a reasonable doubt based on my general understanding of the disease." Moreover, Ledford recognized that the evidence in support of the defense "might" have been inflammatory, but "[i]t was really all [he] thought [they] had left." Ledford further testified that he had informed the petitioner about the defense and that the petitioner understood it.

The petitioner testified that he had spoken with Ledford and an investigator about his case. Although he testified that he had provided Ledford with names of potential witnesses to contact because he believed they could testify in his favor, he could not identify anyone by name. He also confirmed that he would go on walks with the victim, which included walking to the park and

the beach before returning to the apartment where the petitioner was living with the victim and his family. The petitioner maintained his innocence and described the allegations against him as a "plot that the [victim's] mother did."

The habeas court rejected the petitioner's ineffective assistance of counsel claim. In its May 25, 2023 memorandum of decision, the court concluded that the petitioner failed to establish that Ledford's pursuit of a defense predicated on the petitioner's HIV positive status (1) constituted deficient performance and (2) impacted the outcome of the case. It reasoned that, "[i]n the present case, the petitioner professed his innocence and was not interested in discussing any type of plea agreement, so counsel's hands were tied, although he did not have much to work with. The victim was going to testify, had provided detailed accounts of the sexual encounters, and one of his siblings was going to testify as a corroborating constancy witness. There was ample evidence that the petitioner had access to the child. He even admitted taking regular walks with him while watching the child on behalf of his mother. Sometimes, the [choice] of the 'best' defense theory is limited by the circumstances. . . . The petitioner simply told counsel that, 'I didn't do it,' claimed that [the victim's] mother was fabricating the allegations in order to retaliate against him for kicking the family out of his apartment and made vague references to an unknown male he was unable to name as the possible perpetrator. Neither in his discussions with defense counsel or in his testimony before this court was the petitioner able to offer any substantive evidence, such as a third party, an alibi, or other information, which could separate him from the allegations against him. Under the circumstances, counsel attempted to use the one piece of information he had that might be able to indirectly 'prove' the alleged acts did not happen." (Citation omitted.)

For these reasons, the court found that it was not "unreasonable for [Ledford] to have tried to make a

defense out of the only plausible evidence that could have 'separated' [the petitioner] from the victim." In fact, the court "strain[ed] to figure out how one could possibly determine that offering the petitioner's HIV medical status under the guise that a transmissible disease *should have* been transmitted to the victim if the claims made by the victim were true was so inflammatory as to render the choice an unreasonable one." **(**Emphasis in original.**)** It also found that the petitioner failed to establish that "disclosing the HIV status impacted the outcome of the case."

Before we address the substance of the petitioner's ineffective assistance of counsel claim, we first set forth our standard of review and the general principles governing such a claim. "Our standard of review of a habeas court's judgment on ineffective assistance of counsel claims is well settled. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary . . . .

"[I]t is well established that [a] criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. . . . This right arises under the sixth and fourteenth amendments to the United States constitution and article first, §8, of the Connecticut constitution. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . .

"To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . .

To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong. . . .

"In order for a petitioner to prevail on a claim of ineffective assistance on the basis of deficient performance, he must show that, considering all of the circumstances, counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. . . . In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice . . . are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. . . .

"[J]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the

evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; *that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . .* Indeed, our Supreme Court has recognized that [t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . . [A] reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did . . . ." (Emphasis in original; internal quotation marks omitted.) *Morales* v. *Commissioner of Correction*, 220 Conn. App. 285, 304–306, 298 A.3d 636, cert. denied, 348 Conn. 915, 303 A.3d 603 (2023).

Applying the foregoing principles, we agree with the habeas court's conclusion that, under the facts and circumstances of this case, Ledford's decision to predicate the petitioner's defense on the fact that the petitioner was HIV positive and the victim was not, was sound trial strategy and that the petitioner failed to prove otherwise. Ledford, an experienced criminal practitioner, testified that he investigated what he could, considered the evidence and weighed different avenues of defense, and that, after doing so, he determined that this presented not just the "clearer path" to a possible acquittal, but the only viable defense he could pursue under the circumstances. Although he acknowledged that there was not a 100 percent chance of transmittal from unprotected sex, he thought there was enough of a chance to create a reasonable doubt and that pursuing the defense was therefore worthwhile.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments

support the limitations on investigation." (Internal quotation marks omitted.) *Love* v. *Commissioner of Correction*, 223 Conn. App. 658, 669, 308 A.3d 1040, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024). Ledford's decisions to devise and pursue the defense he presented at the habeas trial were plainly strategic and tactical decisions, and, thus, they are presumed reasonable unless proven otherwise. See *Morales* v. *Commissioner of Correction*, supra, 220 Conn. App. 306.

The petitioner argues that Ledford's strategic decisions regarding his defense are not entitled to deference in this case because (1) Ledford's investigation into the defense was inadequate and (2) his decision to introduce the evidence regarding the petitioner's HIV status was "not based on a calculated decision, but on the uninformed opinion that there was not a better defense available to the petitioner." He posits that Ledford's "decision to not call third-party culpability witnesses at trial and to not pursue other avenues of defense are directly tied to his premature decision to pursue the HIV [transmissibility] defense, which was grounded in an incomplete investigation."

The petitioner's argument is belied by the record. Although Ledford did testify as to his "understanding" regarding HIV transmissibility, and he described the defense as based on "common sense," the fact remains that his "commonsense" understanding was well informed. Ledford reviewed the petitioner's medical records and explored the propriety of the theory of defense with a medical professional before proceeding with it. Moreover, and more importantly, Michels-Ashwood expressly testified, as an expert at trial, that it was more probable than not that the HIV would have been transferred to the victim if the petitioner had unprotected sex with him as the victim had claimed. In other words, Michels-Ashwood provided direct support for the theory of defense Ledford investigated and pursued. Moreover, Ledford explained that pursuing a third-party culpability defense and calling the victim's brother to testify at trial in support

thereof would have opened the door to the issue of grooming, which he determined would have been damaging to the petitioner's case. As such, the defense Ledford pursued was, in his determination, "what [he] had left." These are precisely the types of "judgment calls that we consistently have declined to second guess." (Internal quotation marks omitted.) *Morales* v. *Commissioner of Correction*, supra, 220 Conn. App. 314.

On the basis of our review of the record, we conclude that the petitioner failed to demonstrate that his ineffective assistance of counsel claim involved issues that are debatable among jurists of reason, could have been resolved in a different manner, or deserves encouragement to proceed further. The petitioner failed to present sufficient evidence to overcome the presumption that Ledford's decision to pursue a defense predicated on the fact that the petitioner was HIV positive and the victim was not was sound trial strategy.[13] Indeed, we agree with the habeas court's determination that this was the "only plausible evidence that could have 'separated' [the petitioner] from the victim."

In summary, because the petitioner has failed to show that his claims on appeal involve issues that are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the issues are adequate to deserve encouragement to proceed further, the habeas court did not abuse its discretion in denying the petition for certification to appeal with respect to these claims.

The appeal is dismissed.

In this opinion the other judges concurred.

---

[13] In light of this conclusion, we need not address the prejudice prong of the *Strickland* test. See, e.g., *Fair* v. *Commissioner of Correction*, 205 Conn. App. 282, 294, 256 A.3d 163 ("[i]n its analysis, a reviewing court may look to the performance prong or to the prejudice prong [of the *Strickland* test], and the petitioner's failure to prove either is fatal to a habeas petition" (internal quotation marks omitted)), cert. denied, 338 Conn. 910, 258 A.3d 1280 (2021).